GEORGE N. BUCKHOUT *et al. vs.* CITY OF NEWPORT *et al.*

JULY 24, 1942.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CONDON, J.   This is a bill in equity to set aside a convey-
ance of real estate made by the city of Newport to the New-

port Historical Society, a Rhode Island corporation, hereinafter referred to as the society. The complainants are certain taxpayers of the city and the respondents are the city and the society. The cause was heard in the superior court on bill, answer, replication and proof. After the hearing a decree denying and dismissing the bill was duly entered and the complainants have appealed therefrom to this court.

Complainants' appeal raises a number of questions but the main one is whether the city had the power to make the conveyance to the society without specific statutory permission of the legislature. The determination of this question, however, is necessarily dependent on the answers to be given to two subsidiary questions, namely: (1) Is property used by the city in the performance of its governmental functions thereby dedicated or devoted to a public use; and (2) if so, may the city on its own authority abandon such use and thereby free such property from the trust once impressed upon it by such use?

Should the first question be answered in the affirmative and the second in the negative, a still further question will arise, that is, does general laws 1938, chapter 329, § 2 contain a sufficient grant of authority to enable the city to convey any property title to which it holds in fee, whether such property be used in the performance of its governmental functions or its proprietary function? The pertinent part of § 2 is as follows: "Towns may take, purchase and hold real and personal estate, and alienate and convey the same".

A brief statement of the facts, which are undisputed, may be helpful to a consideration of the questions involved: On October 3, 1940 the city, "in consideration of one dollar and other valuable considerations", transferred to the society a "triangular piece of land with the building thereon formerly the location of the Number 5 Engine House, located at the junction of Touro and Mary Streets". Under the deed, the society was given possession on the conditions that the building was "to be maintained as part of its (the society's) plant

and to be used for the care, storage and exhibition of relics of interest to the City of Newport and for the care, storage and exhibition of various articles of historical interest". The city expressly reserved to itself the right to reenter for breach of any of such conditions.

The "triangular piece of land" thus conveyed consisted of three parcels which had been separately purchased by the city for fire protection purposes. The first was purchased from Henry Oman in 1847 "for the purpose", as stated in the deed, "of placing thereon a building to be used as a Fire Engine House and for no other purpose." The second was purchased on June 27, 1851, from William Newton as part of a transaction by means of which the town of Newport became the owner of an engine house belonging to Protection Engine Company No. 5. This engine house apparently stood partly on the Newton parcel and partly on the parcel which the city had purchased from Henry Oman. This building, however, was quitclaimed to the city on June 27, 1851 by a committee of Protection Engine Co. No. 5, thereunto duly authorized by a unanimous vote of the company taken on June 9, 1851. This quitclaim and the deed from William Newton were received for record on the same date and at the same hour, July 26, 1851 at 11 o'clock, a. m.

From June 27, 1851 until late in 1894 the town of Newport and thereafter the city of Newport used these parcels of land with the engine house thereon as a fire station for the fire department. On October 2, 1894 the city council submitted the following question to the taxpayers of the city qualified to vote thereon: "Shall the City Council be authorized to purchase the lot in the rear of the No. 5 Fire Station at a cost of Three thousand dollars and take down the old station and build a new station at an expense not to exceed Nine thousand dollars?" On October 25, 1894 this proposition was approved by such taxpayers. Thereupon the city council formally authorized its committee on fire department to procure plans for the erection of a "Steam Fire Engine Station on the lot at Touro and Mary Streets." On November

21, 1894 the city purchased the above-mentioned parcel of land from William Fludder for $3000 and caused to be erected thereon a new fire station. This station also covered the Newton parcel and a small portion of the Oman parcel.

The new station was used by the fire department until October 2, 1940, when the representative council of the city enacted an ordinance which reduced the number of fire stations in the city to four and thus indirectly discontinued the further use of No. 5. There is no evidence that the representative council expressly abandoned it as no longer fit for further use as a fire station. We understand, however, the respondents to argue that the action of the council was tantamount to an abandonment of the fire station for such purpose.

There was evidence that the area of the land covered by the station was slightly more than 2200 square feet; that the building was of brick construction, consisting of two stories and an attic; that its present reproduction cost would be $65,081; and that its depreciated value was $36,764. This latter evidence was admitted by the superior court over the objections of the respondents, who contended that it was not proper evidence of value. However that may be, we mention it here not for the purpose of showing the value of the building, but merely in order to give a general idea of its substantial character as well as its size.

On the above-stated facts it is clear that the town of Newport and thereafter the city of Newport purchased this land in the beginning for fire protection purposes and that it devoted the land and the improvements thereon to such purposes. In this connection we need not consider what, if any, effect the restrictive language of the Oman deed would have upon the city's right to sell that parcel or to use it for other purposes because we are of the opinion that the city's use, itself, of the land has impressed it with a trust. For this reason the cases cited by the respondents require no consideration as far as they relate to their contention that statements in a deed of purchase describing the purpose for which

the property was purchased by the city do not create a trust unless the deed contains a definite covenant to reconvey.

The question to be determined here is, did the use of this land by the city constitute a public use which the city could not divest without specific statutory authority from the legislature? We are of the opinion that it did. In this state we recognize the distinction between the governmental functions of a city or town and its proprietary functions. In the exercise of the first, the city acts merely as the agent of the state, whereas in the exercise of the second, it is clothed with the same full measure of authority over its property that private corporations and individuals enjoy, unless restricted by its charter or general law.

There can be no question that a city is acting in its governmental capacity when it purchases and uses land with the improvements thereon for fire protection purposes. It is too late to argue as the respondents' do in their brief that the maintenance of a fire department by the city is a "merely private municipal function." The law is well settled to the contrary in almost every American state. 19 R. C. L. § 397; 43 C. J. § 1445. That such is the law seems never to have been doubted here. See *Dodge* v. *Granger,* 17 R. I. 664; *Providence* v. *Hall,* 49 R. I. 230; and *Providence* v. *Moulton,* 52 R. I. 236.

It is not clear from other parts of respondents' brief whether they seriously contend otherwise or whether they wish to have us consider that in this state the cities and towns have inherent powers which make this principle of less consequence here than it is in some other states. They urge that: "In the older Eastern States where many cities and towns were 'de facto' sovereignties before there was any Legislature with jurisdiction over them, broader powers are found in the General Laws in addition to the terms of their charters." If by this assertion the respondents are impliedly contending that Newport, as one of the original towns, has powers that do not necessarily derive from the state, the answer is that this court long ago definitely denied such a

thesis. *Newport* v. *Horton,* 22 R. I. 196, *Horton* v. *Newport,* 27 R. I. 283. See also *Providence* v. *Moulton, supra,* and *In re Warwick Financial Council,* 39 R. I. 1.

In the latter opinion, the judges of this court, in advising the house of representatives as to the source of the powers of our cities and towns, said: "From very early times the course of legislation by the General Assembly has furnished a legislative construction that the towns derived all their powers from the legislative enactments passed from time to time." The courts of our two neighboring eastern states of longer settlement than ours hold the same view. See *Commonwealth* v. *Plaisted,* 148 Mass. 375, and *Waterbury* v. *Macken,* 100 Conn. 107. Such is also the view of outstanding authorities on the law of municipalities. 1 Dillon, Mun. Corp. § 55; 1 McQuillin, Mun. Corp. (2d ed.) 265.

Respondents, however, also argue that they have not found "any convincing definition in the cases between lands 'devoted to a *private* municipal use' and lands 'devoted to a *public* municipal use', and consequently do not believe that to be the true rule of law." They do not tell us what they conceive the true rule to be. From their brief we are left to infer that they believe that only parks, streets and commons are to be comprehended in the term "devoted to a public use"; and also such property as is the subject of a gift for a "charitable, educational, or other public use." In such instances, they argue there is a broad freedom of use by the public as individuals which raises a public easement, whereas no such freedom exists in public property purchased for and applied to a "very restrictive use", such as a fire house.

This is a novel view without any authority cited to support it. Our examination of the cases constrains us to say that it is entirely erroneous. It overlooks the true meaning of the term "public use" as applied to municipal corporations. The term as there used is more comprehensive than respondents suppose. Simply because property, which the city has purchased and used for a public purpose, cannot be enjoyed by the public individually as can parks, streets and

commons, it does not follow that such property cannot be deemed to be held in trust and devoted to a public use. In the law of municipal corporations the test of whether a use is public or private consists in whether the use is made by the city in its governmental capacity or in its proprietary capacity. Applying this test to the case at bar, the land and engine house, having been purchased and used for fire protection purposes, were therefore dedicated or devoted to a public use. *Huron Waterworks Co.* v. *Huron,* 7 S. D. 9; 43 C. J. Mun. Corp. § 2098; 19 R. C. L. Mun. Corp. § 78.

A municipal corporation has no inherent power to convey property devoted to a public use. *Newport Hospital* v. *Ward,* 56 R. I. 45. In that case we expressed the opinion that such was the rule laid down and followed in *Newport Hospital* v. *Ritchie,* 52 R. I. 485, and *Cascambas* v. *Newport,* 45 R. I. 343. While in each of those cases the court was considering a common and not public property acquired by purchase and used by a city or town in the exercise of its governmental function, the guiding rule or principle is nevertheless the same.

The next question is whether the city may on its own authority abandon the use of the property for governmental purposes and thus divest it of the public use impressed upon it. On this point there is some confusion, more apparent than real, in the authorities. Upon examination of the cases we think it will appear that a majority of them go no further than to hold that, where land has been purchased for a public use but has never been actually devoted thereto, the municipality may dispose of it for an adequate consideration under its general power of alienation. Dillon expressly says that a municipality has no implied or incidental power to *extinguish* the public uses in property held by it and devoted to such uses. 3 Municipal Corp. (5th ed.) § 1102.

In each of the following cases the court expressly recognized the general rule that property once actually devoted to a public use cannot be disposed of without specific statutory authority, but held in the case before it that the land·

had never actually been devoted to such use. *Fort Wayne* v. *Lake Shore & Michigan Ry. Co.*, 132 Ind. 558; *Palmer* v. *Albuquerque,* 19 N. M. 285. The *Palmer* case is cited as authority in 19 R. C. L. Mun. Corp. § 78, for the statement that property devoted to a public use "even if the title is in the municipality is held in trust for the people of the state as a whole, and cannot be alienated except by the express consent of the legislature or upon the discontinuance of the public use in the manner provided by law."

In the *Palmer* case the New Mexico court, in effect, placed its decision on the ground that the building, which the city was erecting for use as its city hall and which it found itself financially unable to complete, had never been used for such purpose and therefore had never actually been devoted to a public use. The court cited the *Fort Wayne* case as authority for its holding. In that case the Indiana court approved a sale by the city of a part of a tract of land which the city had bought for park purposes but which it had never used for such purposes. That decision was put on the ground that there had never been any devotion of the land to such a public use. As authority for this holding the court cited *Beach* v. *Haynes,* 12 Vt. 15, where, though the land in question had been purchased for a common and such purpose was expressed in the deed, the court nevertheless held that, as the land had never actually been devoted to such use, the town could validly dispose of it. In a later case, however, where there had been an actual dedication to public use, the same court reached an opposite result. *State* v. *Woodward,* 23 Vt. 92.

From this survey of the authorities it seems to us that the statement in 19 R. C. L. Mun. Corp. § 78 necessarily and logically refers only to an abandonment according to a statute expressly or impliedly authorizing such abandonment. For examples of such cases see *People ex rel. Lehigh Valley R. Co.* v. *State Tax Comm.,* 206 App. Div. 549, 556, and *Brooklyn Park Commissioners* v. *Armstrong,* 45 N. Y. 234, 243. In this last-cited case the court said: "Where the prop-

erty is taken, the owner paid its true value, and the title vested in the public, it owns the whole property, and not merely the use; and, though the particular use may be abandoned, the right to the property remains. The property is still held in trust for the public by the authorities. By *legislative sanction* it may be sold, be changed in its character from realty to personalty, and the avails be devoted to general or special public purposes. . . . The legislature could discharge it from the trust to hold them for a park, and empower it to sell. It has done so, and, so far as any express limitation in our State constitution is concerned, it had the power to do so." (italics ours)

That case was cited and relied on by this court in *Clark* v. *Providence,* 16 R. I. 337. In the latter case this court sustained a special statute which authorized the city to abandon park lands around the cove in Providence and to sell, convey or exchange the land for railroad or other purposes. An authority to abandon property devoted to a public use and dispose of it may also be found to be impliedly granted in a specific statute pertaining to the particular public use. See *Marshall* v. *Mayor of Meridian,* 103 Miss. 206.

We are therefore of the opinion that, while the vote of the representative council may have been effective to curtail the number of fire stations thereafter to be maintained by and for the fire department of the city, it could not, in the absence of legislative authority, divest the fire station of the trust impressed upon it for the public benefit.

This brings us to a consideration of the scope of G. L. 1938, chap. 329, § 2. No case has been cited to us and we have found none wherein the extent of the authority granted by this section has been defined. This court has, however, held that, in so far as it relates to charitable trusts, it is merely declaratory of the common law. *Providence* v. *Payne,* 47 R. I. 444. We are also of the opinion that, in so far as the section relates to the acquiring of real or personal property by purchase and to alienating and conveying the same, it quite obviously has reference only to such property as a city or

town may acquire, hold and use in its proprietary capacity. This must necessarily be so, otherwise a broader construction, which would include property devoted to a public use, would remove all legislative restraint over municipal corporations in selling, transferring, exchanging, or otherwise disposing of any and all property held in fee by such corporations in trust for the public. There is authority which seems to support such a broad construction of similar general statutory grants of authority in other states, but we think the sounder view is that enunciated in *State ex rel. Northern Pacific Ry. Co.* v. *Superior Court,* 136 Wash. 87, wherein the court said it was the consensus of authority that the legislature could authorize a municipality to convey property held in its trust capacity for a particular use, but that it was equally the consensus of opinion that it must be done specially and could not be implied from a general grant of power to acquire, alien and convey. See *People ex rel. Lehigh Valley R. Co.* v. *State Tax Comm., supra,* and *Brooklyn Park Commissioners* v. *Armstrong, supra,* and also *Lewis* v. *Providence,* 10 R. I. 97.

As a final contention respondents argue that the transfer of this property to the society was not a private sale for profit to a private corporation but rather was a transfer by the city to a nonprofit, charitable, public corporation for the service of the public and was, therefore, in reality no more than a change of public use. We cannot agree that the society is in any sense a public corporation, even though it does perform certain services of interest and benefit to the public. See *Proprietors of Mt. Hope Cemeteries* v. *Boston,* 158 Mass. 509. However laudable the objects of the society may be, and they are laudable to a high degree, they are nevertheless not in any way required of the city as the agent of the sovereignty of the state. In using the public property to carry out such objects, it can hardly be said that the society is engaged in the exercise of a public function in the sense that such property is thereby devoted to a public use. But even if it could reasonably be said that it was so engaged, we

would still be bound to say that such change by the city of the public use of its property without the specific authorization of the legislature would be void. "Land appropriated to one public use can not be diverted to another inconsistent public use without plain and explicit legislation to that end." *Higginson* v. *Public School Commissioners*, 212 Mass. 583. See also *Huron Waterworks Co.* v. *Huron, supra,* and cases therein cited; *MacIntyre* v. *El Paso County*, 15 Colo. App. 78, and *Harter* v. *San Jose*, 141 Cal. 659. Respondents cite *Wilbour* v. *Willbur*, 50 R. I. 136, as authority for the statement that it is well recognized that a city may devote land purchased for one public use to a different use. But this case is not authority for so broad a statement. On the contrary, a reading of the case will show that it is one of special and peculiar circumstances.

For the reasons above stated, we are of the opinion that the superior court erred in denying and dismissing the complainants' bill. Good ground was shown for, at least, the setting aside and cancellation of the deed to the society and such relief should have been granted.

The complainants' appeal is sustained and the decree appealed from is reversed. The parties may appear in this court on October 5, 1942, and present a form of decree, in accordance with this opinion, for entry in the superior court.

*Cornelius C. Moore, Charles H. Drummey,* for complainants.

*Jeremiah A. Sullivan,* City Solicitor, *William MacLeod, Sheffield & Harvey,* for respondents.