SIEJACK ET UX. *v.* MAYOR AND CITY COUNCIL
OF BALTIMORE ET AL.

[No. 115, September Term, 1973.]

*Decided January 3, 1974.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Leroy W. Preston,* with whom was *J. William Martin* on the brief, for appellants.

*Richard K. Jacobsen* and *Bernard A. Greenberg,* Assistant City Solicitors, with whom were *George L. Russell, Jr., City Solicitor,* and *James B. Murphy, Special Assistant Solicitor,* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Here we must deal with questions arising out of the acquisition by the State Highway Administration (SHA) [1] of the Colgate Pay Dump. At the core of this phase of the litigation is a 12.90457 acre parcel on Herring Run, in Baltimore County (County), just east of the eastern boundary of Baltimore City. The Mayor and City Council of Baltimore (City) claims record title; Siejack [2] says that he has both record title and title by adverse possession.

By deed dated 27 July 1964 Siejack acquired from his parents four parcels of land. Parcels 1 and 2 lie wholly within Baltimore City; parcel 3 lies partly within the City and partly within the County; parcel 4 lies wholly within the County. Parcels 1, 2 and 3 are contiguous; parcel 4 is about 100 yards to the east; it is separated from the others by an interjacent 30 acre tract then belonging to Robb Tyler and since acquired by SHA. Parcel 4 would have been landlocked had it not enjoyed a right-of-way from parcel 3 across the Tyler property. Siejack's parents had acquired parcels 1, 2, 3 and 4 in April 1949.[3] In parcels 1, 2 and 3 there are about 13.5 acres; in parcel 4 there are about 26 acres.

---

1. This litigation was initiated by the State Roads Commission, now the State Highway Administration, a division of the Department of Transportation.

2. The land is owned by the appellants, Siejack and his wife, but for convenience we shall use the singular.

3. Although lacking in significance here the record suggests that in 1961 the elder Siejacks conveyed about 3 acres to the City and the County in connection with the canalization of Herring Run.

In January 1971 SHA filed a petition for the condemnation of parcels 1, 2 and 3, declaring they were needed for the construction of "Interstate Route 95," an east-west expressway in the City. Siejack, the City and the County were named as defendants. Conformable to the "quick take" provisions [4] SHA deemed the "fair value of the land and improvements taken and damages done" to be the sum of $72,800, a check for which it deposited with the Clerk of the Circuit Court for Baltimore County.

In March 1972 Siejack, answering SHA's amended petition, recited his claim of ownership of parcel 4 and the denial of all access to it by virtue of the taking of parcels 1, 2 and 3. The resulting damage, he declared, would be "in excess of $800,000."

Between January 1971 and August 1972 the parties for the most part busied themselves with minor quarrels, none of which requires our consideration. In August 1972, however, SHA filed a motion for a declaratory judgment, raising for the first time the likelihood of conflicting claims of ownership in respect of parcel 4. Conceding that parcel 4 is, "in fact, landlocked" it alleged that "in order to post the funds and pay compensation to the lawful owner" thereof and "to determine [its] fair market value . . . it is necessary that ownership of the area" be determined. Upon SHA's motion the court passed an order requiring Siejack and the City to show cause why the court should not determine the title to parcel 4. Siejack answered claiming "good and marketable fee simple title" to the entire parcel. The City answered, claiming title to what amounts to the north one-half. SHA filed with its motion for a declaratory judgment Plat No. I-95-107 which delineated the part claimed by the City (12.90457 acres, "more or less"), which we shall call parcel 4N, and the part conceded to be owned by Siejack (13.97002 acres, "more or less"), which we shall call parcel 4S.

The issue came on to be heard before Hamill, J., on 15 January 1973. The evidence offered by Siejack seems to have

---

4. Code (1971 Repl. Vol.), Art. 89B, § 9, *Amended effective July 1, 1973,* Code (1973 Cum. Supp.), Art. 89B, § 9; Maryland Rule U.

established a source of record title to parcel 4 at least as far back as 1852. The evidence offered by the City seems to have established a source of title in Albert H. Wehr to whom the State of Maryland granted a patent for parcel 4N on 15 April 1902. The patent is recorded among the Land Records of Baltimore County. Wehr conveyed parcel 4N to the Baltimore County Water and Electric Company in September 1902. In September 1921 that company conveyed parcel 4N to the City, along with a number of other properties.

We shall avoid the arduous task of arbitrating the conflicting claims of title by assuming that the City acquired title by virtue of the 1921 deed. At the close of the hearing, which had gone on for several days, Judge Hamill, in an oral opinion delivered from the bench, said he was

> " . . . of the opinion that the City of Baltimore has a superior record title to this land by virtue of the 1902 patent. However [he went on to say], the evidence clearly indicates to me that the City . . . has been divested of that title by adverse possession on the part of Siejack. [His] testimony is uncontradicted and undisputed that he has been on the property and operating it since 1949, and paying taxes on it since that time . . ."

The City moved promptly for a reargument which, over Siejack's objection, was granted. The learned judge was persuaded to change his mind; in his second oral opinion, delivered from the bench, he reaffirmed his conclusion that the City had a "superior record title to" parcel 4N. In respect of the divestiture by adverse possession, however, he held that the City had

> " . . . not been divested by adverse possession because of the ruling in Messersmith v. Riverdale, 223 Md. 323 [164 A. 2d 523 (1960)]. . . . [T]he acquisition of property for the operation of a public water works is as much a public trust as the operation of a public park; nor [he found] has it ever been intentionally abandoned by the City . . . ."

It seems entirely clear to us, as it did to Judge Hamill, that Siejack (and his father) held parcel 4N adversely and continuously since 1949. Their successive possessions were actual, open, visible, notorious, exclusive, hostile, and under color of title. Indeed, one would be hard pressed to find a case in which all of the elements of adverse possession so clearly appear. The City advanced the notion of "dual possession" but we see no merit in it, especially in view of testimony that, although Siejack's possession and use of parcel 4N was reported to the City Engineer's office in 1954 and although soon thereafter an investigation of the City's title was made by an Assistant City Solicitor, no move was ever made to eject Siejack or to challenge his right to own, possess and use parcel 4N. The only question now to be resolved is whether Judge Hamill erred in concluding that title could not be acquired by adverse possession against the City.

Quite likely nothing is more solidly established than the rule that title to property held by a municipal corporation in its governmental capacity, for a public use, cannot be acquired by adverse possession. *Desch v. Knox,* 253 Md. 307, 252 A. 2d 815 (1969); *Mayor and City Council of Baltimore v. Chesapeake Marine Railway Co.,* 233 Md. 559, 197 A. 2d 821 (1964); *Messersmith v. Mayor and Common Council of Riverdale,* 223 Md. 323, 164 A. 2d 523 (1960). Less frequently encountered, however, although apparently as well established, is the notion that municipal property not devoted to a public use can be so acquired. 10 McQuillin, *Municipal Corporations* § 28.55 (1966 Rev. Vol.); 2 C.J.S. *Adverse Possession* § 20; 3 Am. Jur. 2d *Adverse Possession* § 206 and cases therein cited. Until now we seem not to have been required to consider whether it should be acknowledged to be the law of Maryland. We think it is and we so hold, but it must not be supposed that our holding goes any further than the case at bar or any other or future case having a similar factual background.

In *Montgomery County v. Maryland-Washington Metropolitan District,* 202 Md. 293, 96 A. 2d 353 (1953), Chief Judge Sobeloff, for the Court, said:

" . . . Pursuing the inquiry further, we find that a county may hold property in either of two capacities, one being governmental and the other proprietary. A distinction is frequently drawn between property held by a county in its proprietary capacity and that held by it in its governmental capacity. Property which is held in a governmental capacity or is impressed with a public trust, cannot be disposed of without special statutory authority. *Worcester Elec. Co. v. Hancock, supra* [151 Md. 670, 135 A. 832]; *Buckhout v. City of Newport,* 68 R.I. 280, 27 A. 2d 317, 141 A.L.R. 1440; *Southeastern Greyhound Lines, Inc. v. City of Lexington,* 299 Ky. 510, 186 S.W.2d 201; *San Diego County v. Calif. Water & Telephone Co.,* 30 Cal.2d 817, 186 P. 2d 124, 175 A.L.R. 747. But as to property held in a proprietary capacity and not dedicated to public use, or impressed with a trust, the rule is otherwise. . . .

\* \* \*

"With respect to the County's contention that it was without power to dispose of its real estate we find, in accordance with the majority view, that the County, by making the disputed conveyance, did not act *ultra vires.* "*Id.* at 303, 306.

The land which was the subject of that litigation had been bought with the proceeds of a bond issue as a site for county offices but for at least 13 years no use had been made of it.

The history of parcel 4N seems to us sufficient to rebut any notion that the City had ever devoted it to public use and that it is unlikely it ever intends to do so. In 1918 the General Assembly authorized the annexation to Baltimore City of certain parts of Anne Arundel and Baltimore counties. Laws of Maryland of 1918, Chap. 82. Section 17 of the Act required the City, before extending its "water service into any territory occupied by any existing water company," to "acquire either by purchase or condemnation the property of such water company in the territory into

which the Baltimore City water service is to be extended." The City, in its brief, concedes that "obviously" the Legislature intended to benefit the owners of water companies. A partial taking "would effectively put the water company out of business, and the Legislature felt that the company was entitled to expect that all of its land would be purchased by . . . [the City] whether or not it was intended to be used for the municipal water system." The transfer was made in September 1921; the stated consideration was $1,932,256.39. The only thing retained by the company was "the franchise to be a corporation." The City concedes it was *obliged* by the Legislature to make the purchase and one can readily imagine the kind of political pressures that may have been responsible for requiring the City to do so. The City further concedes that the acreage, including parcel 4N, "was never used by the City for this purpose or for any other purpose." We may be thought a bit snide for saying so but it does seem to us that the nearly $2,000,000 consideration was a part of the price paid for the right to annex and that the land was a somewhat less than welcome consolation prize.

While it is unnecessary for us to reach the question of abandonment, there is evidence pointing in that direction. Siejack's presence on the property could hardly have been called a secret. He said he had been there every day. He charged his customers for the privilege of dumping their trash. His employees assayed the loads to determine the fee to be paid. He made daily use on the property of two front-end loaders, two big bulldozers, a drag line crane and five dump trucks. He made excavations into which the trash was dumped, and then covered the trash with earth. Indeed, he may have been something of a nuisance to the City. In April 1969 there was "a serious and hazardous fire" on the dump which the City's fire department was called upon to extinguish; in this proceeding the City is claiming a lien of $7,881.93 for services rendered in that connection. In footnote 3 we referred to 1961 negotiations between Siejack's father and the City for the acquisition of a few acres for the canalization of Herring Run.

We think Judge Hamill erred when, relying upon

*Messersmith, supra,* he receded from his earlier decision. There are circumstances which distinguish *Messersmith* from the case at bar but only one need be mentioned. The deed to the municipal corporation was limited by the habendum clause to use as a "public park and parking for the use of the public and especially for the lot owners of the Town of Riverdale."

> *Order of 24 January 1973 reversed.*
>
> *Case remanded for the passage of an order conformable to the views expressed in this opinion and for further proceedings.*
>
> *Costs to be paid by the Mayor and City Council of Baltimore.*