*Montgomery County, Maryland v. Ajay Bhatt*, No. 36, September Term, 2015. Opinion by Harrell, J.

**RAILROADS - ADVERSE POSSESSION**

Adverse possession does not lie against lands devoted to public use and owned by State or local government, such as public highways. Because railroad lines, even if privately-owned, have been treated as equivalent to public highways, a railroad line reserved for public use is not subject to a claim of adverse possession, except where abandonment of the public use is clear.

**RAILROADS – ABANDONMENT OF RIGHT-OF-WAY**

Abandonment of a rail line requires both an intent to abandon and an act that demonstrates unequivocally that intent. The interim use of a former rail line's right-of-way for a hiker/biker trail as an interim use, under the Federal National Trails System Act, does not demonstrate an intent to abandon the public use right-of-way, especially where a new ultimate use of the right-of-way as a commuter rail line is intended.

Circuit Court for Montgomery County
Civil Case No. 8929D
Argued: December 3, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 36

SEPTEMBER TERM, 2015

---

MONTGOMERY COUNTY, MARYLAND

v.

AJAY BHATT

---

Battaglia,
Greene,
Adkins,
McDonald,
Watts,
Rodowsky, Lawrence F., (Retired,
     Specially Assigned),
Harrell, Glenn T., Jr. (Retired, Specially
     Assigned),

JJ.

---

Opinion by Harrell, J.

---

Filed: January 22, 2016

Driving that train, high on cocaine,
Casey Jones you better watch your speed.
Trouble ahead, trouble behind,
And you know that notion just crossed my mind.

-The Grateful Dead, *Casey Jones,* on
Workingman's Dead (Warner Bros. Records 1970).

Although the record of the present case does not reflect a comparable level of drama as captured by the refrain of "Casey Jones," it hints at plenty of potential trouble, both ahead and behind, for a pair of public works projects (one in place and the other incipient) cherished by the government and some citizens of Montgomery County.

The Capital Crescent Trail is a well-known hiker/biker route that runs between Georgetown in the District of Columbia and Silver Spring, Maryland. Its path was used formerly as the Georgetown Branch of the Baltimore & Ohio (B&O) Railroad.[1] After the trains stopped running in 1985, the property was transferred in 1988 to the government of Montgomery County, Maryland, via a quit-claim deed for a consideration of $10 million. It is planned that the Maryland portion of the former rail line (and current interim hiker/biker trail) will become the proposed Purple Line, a commuter light rail project between Bethesda and Silver Spring. This case raises, among other questions, whether a private landowner adjacent to the rail line may acquire by adverse possession a portion of the right-of-way through erection of a fence and installation of a shed that encroached for

---

[1] Montgomery Cnty Dep't of Parks, *Capital Crescent & Georgetown Branch Trails,* http://www.montgomeryparks.org/PPSD/ParkTrails/trails_MAPS/Crescent.shtm [https://perma.cc/39HX-VGTM].

more than twenty years upon the railroad right-of-way. Under the circumstances present here, we conclude that the private property owner cannot prevail.

## BACKGROUND

Respondent Ajay Bhatt owns 3313 Coquelin Terrace (a subdivided, single-family residential lot – "Lot 8" – improved by a dwelling) in Chevy Chase, Montgomery County, Maryland. He purchased this property in 2006 from his aunt, who owned the property since at least the 1970s. The lot abuts the Georgetown Branch of the B&O Railroad/Capital Crescent Trail. In 1890, the right-of-way that was the rail line (and is today the hiker/biker trail) was conveyed in a fee-simple deed from George Dunlop, grantor, to the Metropolitan Southern Railroad Company ("the Railroad"), grantee. The 1890 Deed conveyed to the Railroad a "strip, piece or parcel of land. . .Beginning at Station 59 plus 52, a point on the located centre line of the Metropolitan Southern Railroad, the same being in Rock Creek and on the line dividing the lands of Richard Ray and the said George Dunlop." The Deed established a right-of-way 45 feet on either side of the center line of the tracks throughout the rail line. A freight-hauling operation was maintained thereafter on the rail line right-of-way until 1985.

The right-of-way was obtained by the County via quitclaim deed in 1988 from the Railroad pursuant to the federal Rails-to-Trails Act.[2] The right-of-way is held and

---

[2] *See* National Trails System Act, 16 U.S.C § 1241, et seq.

maintained under a "Certificate of Interim Trail Use" pursuant to 49 CFR 1152.29.[3]  This

"Certificate" allows the County to preserve the land as a hiker/biker trail until the County

chooses whether and when to restore a form of rail service within the right-of-way.  Thus,

the right-of-way is listed currently by federal regulators in a "rail bank" under a

presumption that the railway may be restored for rail use in the future.  It is the County's

intent to develop within the right-of-way the planned "Purple Line" commuter rail.

---

[3] This section provides:

> If any state, political subdivision, or qualified private organization is interested in acquiring or using a right-of-way of a rail line proposed to be abandoned for interim trail use and rail banking pursuant to 16 U.S.C. 1247(d), it must file a comment or otherwise include a request in its filing (in a regulated abandonment proceeding) or a petition (in an exemption proceeding) indicating that it would like to do so. The comment/request or petition must include:
>> (1) A map depicting, and an accurate description of, the right-of-way, or portion thereof (including mileposts), proposed to be acquired or used;
>> (2) A statement indicating the trail sponsor's willingness to assume full responsibility for:
>>> (i) Managing the right-of-way;
>>> (ii) Any legal liability arising out of the transfer or use of the right-of-way (unless the user is immune from liability, in which case it need only indemnify the railroad against any potential liability); and
>>> (iii) The payment of any and all taxes that may be levied or assessed against the right-of-way; and
>> (3) An acknowledgment that interim trail use is subject to the sponsor's continuing to meet its responsibilities described in paragraph (a)(2) of this section, and subject to possible future reconstruction and reactivation of the right-of-way for rail service.

49 C.F.R. § 1152.29(a).

On 18 October 2013, Montgomery County issued to Bhatt a civil citation asserting a violation of § 49-10(b) of the Montgomery County Code[4], which prohibits a property owner from erecting or placing "any structure, fence, post, rock, or other object in [a public] right-of-way." The factual predicate of the claimed violation was the placement and maintenance by Bhatt's predecessors-in-interest of Lot 8 of a fence and shed within the former rail line (and current hiker/biker trail) right-of-way, without a permit. The civil citation case was heard originally on 21 January 2014 in the District Court of Maryland, sitting in Montgomery County. The District Court found Bhatt guilty of a violation of

---

[4] The exact language of § 49-10 prohibits a person from doing the following within a public right-of-way:

(a) do any reconstruction or maintenance work; or
(b) erect or place any structure, fence, post, rock, or other object in the right-of-way, except:
    (1) mail boxes mounted on a support that will bend or break away on impact by a vehicle;
    (2) individual residential newspaper boxes mounted on a support that will bend or break away on impact by a vehicle;
    (3) street trees placed and maintained under Section 49-33(j);
    (4) ground cover placed and maintained under Section 49-33(k);
    (5) a temporary, removable obstruction or occupation of a right-of-way installed under a permit issued under Section 49-11; or
    (6) as otherwise permitted by law.
Any object placed in the public right-of-way under this subsection must not unreasonably impede use of a sidewalk or other right-of-way by pedestrians or persons in wheelchairs, or impede or endanger automobiles or other vehicles.

Mont. Cnty. Code 2007, § 49-10. The exceptions provided in § 49-11 apply only after an individual has received a permit from the Director of Permitting Services, but still do not allow a private citizen to place a permanent structure on the public right-of-way. *See* Mont. Cnty. Code § 49-11.

§ 49-10(b) and ordered him to remove the fence and shed encroaching upon the County's right-of-way. The District Court required Bhatt to pay $5.00 in court costs, but suspended the $500 fine imposed previously by the County. Bhatt appealed timely to the Circuit Court for Montgomery County.

The appeal was heard *de novo* by the Circuit Court on 28 August 2014. The County presented evidence establishing that its right-of-way lies immediately adjacent to the rear property line of Lot 8. Ralph Wolfe, a right-of-way inspector, and Thomas Yoakum, a certified land surveyor, relied on aerial photographs, the 1890 Dunlop Deed, Bhatt's deed and subdivision plat, and geographical information system ("GIS") photographs from which to conclude that Bhatt's fence and shed were located on the County's right-of-way. The parties stipulated that:

> [T]he fence goes beyond the lot line of the – what's called Lot 8[the Bhatt lot], in the plat for the subdivision, that was created in 1946. We could stipulate to that. We cannot stipulate that the property beyond that lot line is owned by the county, or that it was owned by the railroad. We're not going to do that. But we can stipulate the fence goes beyond the lot line that was established in the plat.

With regard to the type of real property interest held by the County in the right-of-way, a Montgomery County real property attorney and expert accepted by the court in "real estate law and titles" was called by Bhatt to present his conclusions regarding the 1890 Deed and the County's interest. The expert testified that the County received from the Railroad "a deed of bargain and sale so it was a transfer of the fee interest in the property and the Railroad held title to that property until 1988." Because the County

5

owned the right-of-way in fee simple, he believed it impossible, as a matter of law, for the County to have acquired a mere easement interest in the right-of-way.

Bhatt's defense to the charged violation of § 49-10(b) was that he owned the encroached-upon land by adverse possession established by his predecessors in interest, who erected the fence. From memories of his childhood visits to his aunt's home on Lot 8, Bhatt testified that the fence had been present, as far back as he could remember. He recalled specifically seeing the fence in 1977 when he was eight years old. Additional witnesses presented by Bhatt testified that the fence had been present since the 1960s. No evidence was presented as to when the fence was installed exactly or why it was placed beyond the rear lot line of Lot 8.[5] The Circuit Court concluded that the fence had been present on Lot 8 since 1960.

Bhatt argued that, because the fence had been located beyond the property line of Lot 8 since at least 1963, the Railroad was obliged to take action to remove it prior to the maturation of the twenty year period for adverse possession.[6] Bhatt testified further that he applied for a permit to (and was granted by) the County in 2013 to repair and replace the fence. Without hiring a surveyor (and reportedly being himself unaware of the actual

---

[5] The date of installation of the shed, which is also within the fenced-in encroachment area, was not established separately. This gap in proof is not material because the fence encircled the shed and delineated the boundaries of the greater encroachment.

[6] Bhatt argued that the fence was erected initially in 1963, so the railroad company had until 1983 to take action to cause it to be removed before his predecessors-in-interest's claim to the property ripened through adverse possession.

6

property lines of the subdivided Lot 8), Bhatt based his application on the belief that the original fence was located on or within the boundaries of Lot 8. He presented additional evidence that the County had installed chain link fences on the hiker/biker trail and performed maintenance on the property outside his fence, but that the County did not perform any maintenance within his fence line.

On 31 December 2014, the Circuit Court vacated the District Court's judgment and dismissed the violation citation issued by the County. Following post-trial motions, an amended memorandum opinion was filed by the Circuit Court on 2 March 2015. In that opinion, the Circuit Court concluded penultimately (on the strength largely of Bhatt's real property attorney's expert opinion testimony) that the County did not have a "right of way" easement over the former rail line, but rather had been conveyed a fee simple interest in 1988. The expert opined that the term "public right-of-way," as used in the ordinance, referred solely to one held by easement. Because the County thus did not have a "right of way" over the property, Bhatt could not be considered in violation of § 49-10(b). As this reasoning continued, because the conveyance to the County did not result in the acquisition of a "right of way," the Circuit Court concluded ultimately that Bhatt had a creditable claim for adverse possession. Moreover, the hearing judge did not feel obliged to conduct an abandonment analysis: "An abandonment analysis is unnecessary because the land was granted in fee simple, and cannot reasonably be defined as a right-of-way under federal, state, or local laws." The Circuit Court made no final declaration or determination, however, as to who held title to the encroachment area

because it was not asked by the parties to decide that point conclusively in the context of the Code enforcement dispute that was at the heart of the litigation.

The County petitioned this Court for a writ of certiorari. On 17 June 2015, we granted the Petition, *Montgomery County v. Ajay Bhatt*, 443 Md. 234, 116 A.3d 474 (2015), to consider the following questions:

> 1) Did the lower court err in holding that the 1890 deed from George Dunlop to the Metropolitan Southern Railroad Company did not convey a right-of-way?
>
> 2) Did the County prove that the Respondent's fence and shed encroached upon the right-of-way that was originally purchased by the Metropolitan Southern Railroad Company and later conveyed to the county for the Georgetown Branch/Capital Crescent Trail?
>
> 3) Is a railroad right-of-way susceptible to a private claim for adverse possession via an adjacent landowner's encroachment when the right-of-way was actively used for a railway line and when there was no evidence of abandonment by the railroad?
>
> 4) Did the lower court err in holding that the Respondent acquired title to a former railroad right-of-way by adverse possession?

In order to resolve this case, we need answer only the last two questions. In so doing, the result is that we shall reverse the judgment of the Circuit Court for Montgomery County.

**STANDARD OF REVIEW**

In reviewing an appeal from a judgment entered following a bench trial, under Maryland Rule 8-131(c), we "will review the case on both the law and the evidence [and] will not set aside the judgment of the trial court on the evidence unless clearly erroneous." Factual findings will be reviewed for clear error, but questions of law "require our non-deferential review." *Breeding v. Koste*, 443 Md. 15, 27, 115 A.3d 106,

8

113 (2015). Here, we are asked to consider the Circuit Court's interpretation of the 1890 Deed and its conclusion that the County interest was subject to divestiture by adverse possession. Both questions, if needed to be answered, are legal ones subject to *de novo* scrutiny.

## DISCUSSION

### I. Contentions

The County contends that the Circuit Court erred in concluding that the quality of the interest the County holds in the former rail line strip of land was not susceptible to being characterized as a "right of way." The County maintains that "there is no exclusive manner in which the title to a right of way must be held." The County contends further that, because this Court has considered previously a railroad line to be analogous to a public highway for most purposes, the land in question is not subject to an adverse possession claim.

Bhatt responds that he proved sufficiently all of the required elements to sustain a colorable adverse possession claim to the encroached area within his fence. He argues that "the County has not cited a single Maryland decision holding that a privately-owned railway is immune to adverse possession." Furthermore, Bhatt rejects the public highway-railroad line analogy because the land was in private, not public, use during its operation as a rail line (when his adverse possession interest ripened assertedly to fruition).

### II. Analysis

#### a. Railroads as Public Highways

9

"A railroad is in many essential respects a public highway, and the rules of law applicable to one are generally applicable to the other." *Read v. Montgomery Cnty.*, 101 Md. App. 62, 68, 643 A.2d 476, 478 (1994) (internal citation omitted). Railroads are owned frequently by private corporations, but this "has never been considered a matter of any importance that the road was built by the agency of a private corporation [because] the function performed is that of the State." *Olcott v. Fond du Lac Cty.*, 83 U.S. 678, 695 (1872). Railroad companies operate as a public use and "are not viewed strictly as private corporations since they are publicly regulated common carriers. Essentially, a railroad is a highway dedicated to the public use [and is granted] the status of a quasi-public corporation." *Chevy Chase Land Co. v. United States*, 355 Md. 110, 149, 733 A.2d 1055, 1076 (1999) (citing *Marthens v. B & O R. Co.*, 289 S.E.2d 706, 711 (W. Va. 1982)).

Another well-cited example of this dedication to public use is the exercise by railroads of the power of eminent domain, "a power reserved only to the government and those the government has annointed." *Chevy Chase Land Co.*, 355 Md. at 147, 733 A.2d at 1075; *see also Riden v. Philadelphia, B. & W. R. Co.*, 182 Md. 336, 344, 35 A.2d 99, 102 (1943) ("By express provision of the Maryland Railroad Law, every railroad company incorporated under the laws of this State is empowered to acquire land either by purchase or condemnation for as many sets of tracks as are deemed necessary from time to time between its termini within the State"); *see* Md. Const. Art. III, § 40. The Supreme Court explained:

Very early the question arose whether a State's right of eminent domain could be exercised by a private corporation created for the purpose of constructing a railroad. Clearly it could not, unless taking land for such a purpose by such an agency is taking land for public use. The right of eminent domain nowhere justifies taking property for a private use. Yet it is a doctrine universally accepted that a State legislature may authorize a private corporation to take land for the construction of such a road, making compensation to the owner. What else does this doctrine mean if not that building a railroad, though it be built by a private corporation, is an act done for a public use? And the reason why the use has always been held a public one is that such a road is a highway, whether made by the government itself or by the agency of corporate bodies, or even by individuals when they obtain their power to construct it from legislative grant.

*Olcott*, 83 U.S. at 694-95. The Maryland courts "have long considered a railroad line as analogous to a public highway," *see Chevy Chase Land Co.*, 355 Md. at 147, 733 A.2d at 1075, and we have been offered no compelling reason in the present case to reject that analogy.

### b. May a public highway (or any portion of its right-of-way, no matter the type of real property interest by which it is held) be possessed adversely by an abutting private citizen?

A claim for adverse possession requires the establishment of a very specific set of well-known elements[7], but first the subject property must be subject to this type of claim before considering whether the elements may exist in a given case. The Circuit Court concluded that Bhatt touched all of the bases of a viable claim of adverse possession by

---

[7] To state a claim for adverse possession: "[T]he claimant must show possession of the claimed property for the statutory period of [twenty] years.... Such possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted for the twenty-year period." *Breeding v. Koste*, 443 Md. 15, 28, 115 A.3d 106, 113-14 (2015)(citing *White v. Pines Cmty. Improvement Ass'n, Inc.*, 403 Md. 13, 36, 939 A.2d 165, 178 (2008)).

11

showing that his "possession of the property was actual, open, notorious and visible, exclusive, hostile, and continuous for the twenty-year statutory period." We have held, however, that "nothing is more solidly established than the rule that title to property held by a municipal corporation in its governmental capacity, for a public use, cannot be acquired by adverse possession." *Seijack v. City of Baltimore,* 270 Md. 640, 644, 313 A.2d 843, 846 (1974). Because a railroad is a quasi-public corporation under established Maryland law, it follows, to our thinking, that a railroad is counted among these municipal corporations and its real property is not subject to a claim of adverse possession under all but the most narrow circumstances.

The seminal case in Maryland on the issue of the ability to possess adversely the property of a municipal corporation is *Ulman v. Charles St. Avenue Co.,* 83 Md. 130, 144, 34 A. 366, 369 (1896), which decided that "an abutting owner cannot, by encroaching on a public road, acquire title adverse to the public rights therein." "An encroachment on a highway is settled conclusively in Maryland to be a public nuisance, which can never grow by prescription into a private right." *Sieling v. Uhl*, 160 Md. 407, 153 A. 614, 620 (1931). Thus, the "well-established rule of the common law is [ ] that 'the common right of way' cannot be lost by the attempted adverse possession of a private individual." *Id.* (citation omitted).

In *Ulman*, a turnpike company (a State franchisee) acquired in 1854 rights to a strip of land of a width of 66 feet within which it was authorized to build a road. "Within a year or two thereafter, [the company] constructed a road of a width varying from 20 to 38 feet only." *Ulman*, 83 Md. at 140, 34 A. at 367. The company did not seek thereafter to

12

widen the road until over 40 years after the initial acquisition, at which time it sought to expand the width of the active road to the entire 66 feet. *Ulman*, 83 Md. at 140-41, 34 A. at 367-68. Between the completion of the initial road construction, but prior to the company's intended expansion, an adjacent landowner built a sidewalk, installed drains, and planted trees on 15 feet of land encroaching into the turnpike company's strip. *Ulman*, 83 Md. at 139-40, 34 A. at 367. The landowner maintained these improvements for more than the statutory period for adverse possession and sought to claim title by adverse possession. *Id.* Although the turnpike company had not made active use as a road of the disputed strip, this Court held that an adjacent landowner could not maintain an adverse possession claim to the land. *Ulman*, 83 Md. at 143-44, 34 A. at 368. Because "time does not run against the state, or the public,"[8] it followed that public highways are not subject to a claim for adverse possession, except in the limited circumstances of a clear abandonment by the State. By parity of reasoning applied to the present case, railway lines would also not be subject to a claim for adverse possession, without evidence of clear abandonment or a clear shift away from public use.

### c. Use of the right-of-way

Bhatt relies on the "notion that *municipal property not devoted to a public use can be so acquired*" through adverse possession. *Seijack,* 270 Md. at 644, 313 A.2d at 846

---

[8] *See Ulman*, 83 Md. at 145, 34 A. at 368 ("To protect highways from encroachments that it is the business of no one to resist, requires that the [company] be allowed to resume its rights at any distance of time, disregarding any loss to those who have appropriated and erected improvements on the public domain").

(emphasis supplied).  We do not disagree that property, at one time dedicated to the public use, but abandoned subsequently, may be possessed adversely.  The general rule in Maryland has been:

> that the right and title to a mere easement in land acquired by a quasi-public corporation, either by purchase, condemnation or prescription, for a public purpose is dependent upon the continued use of the property for that purpose, and when such public use is abandoned the right to hold the land ceases, and the property reverts to its original owner or his successors in title.

*East Washington Ry. Co. v. Brooke*, 244 Md. 287, 293, 223 A.2d 599, 603 (1966).  We do not find in this record, however, that there is any evidence of abandonment by the rail line operator (or Montgomery County) or that the right-of-way was taken out of public use such that a claim for adverse possession could ripen within this right-of-way.

In order to be considered "immune" from a claim for adverse possession, the right-of-way must remain in public use.  There is "[n]o satisfactory single clear-cut rule regarding what is a public use, which can decide all cases, [that] has yet been formulated." *Prince George's Cnty. v. Collington Crossroads, Inc.,* 275 Md. 171, 181, 339 A.2d 278, 284 (1975).  Public use does not require necessarily that the public must "literally or physically be permitted to use the property." *Id.*  The meaning "under Article III, § 40, of the [Maryland] Constitution is broader than literal use by the members of the public, and . . . actual use of the condemned property by the general public is not necessary." *Green v. High Ridge Ass'n, Inc.*, 346 Md. 65, 74, 695 A.2d 125, 129 (1997).

Bhatt leans heavily on *Read*, 101 Md. App. at 67, 643 A.2d at 478, to conclude

that the right-of-way here was susceptible to an adverse possession claim because the

right-of-way was no longer in public use. The intermediate appellate court's opinion in

*Read* is not persuasive because it focuses on the distinction "between property held by a

railroad company as an easement and property held by a railroad company in fee simple,"

*id*, a distinction we find not material in the context of the present case.[9]

---

[9] Historically, a right-of-way "in its strict meaning, is 'the right of passage over another man's ground;' and in its legal and generally accepted meaning, in reference to a railway, it is a mere easement in the lands of others, obtained by lawful condemnation to public use or by purchase." *Chevy Chase Land Co. v. United States*, 355 Md. 110, 124, 733 A.2d 1055, 1062 (1999) (citing 2 Elliott on Railroads § 1158, at 628 n. 77 (3d. ed. 1907)). At that time, the term "right of way" was equated typically to an easement, rather than a fee-simple interest. *Chevy Chase Land Co.*, 355 Md. at 124-25, 733 A.2d at 1062 (citing 2 Elliott on Railroads § 1158, at 628 n. 77 (3d. ed.1907)). We explained further that "[i]n railroad parlance, the term 'right of way' has two meanings: in one sense it is 'the strip of land upon which the track is laid'; in the other sense it is 'the legal right to use such strip,' and in this sense it usually means the right of way *easement*." *Chevy Chase Land Co.*, 355 Md. at 124, 733 A.2d at 1062 (citations omitted).

The phrase "right of way" is more properly, however, a term of art, rather than a term of science or law: "Maryland courts have often construed deeds of 'rights-of-way' to railroads as easements or have used the terms 'easement' and 'right-of-way' synonymously." *Chevy Chase Land Co.*, 355 Md. at 125, 733 A.2d at 1063. It is well-settled "that a deed to a railroad, even though it characterizes the grant as conveying a right-of-way, may convey an estate in fee simple." *Chevy Chase Land Co.*, 355 Md. at 128, 733 A.2d at 1064. Thus, for the purposes of this litigation (i.e., the scope and application of Montgomery County Code § 49-10(b)), it is immaterial whether the right-of-way in question was held in fee simple or by easement. Indeed, given the clear purpose of § 49-10 of the Montgomery County Code (*see* n.4 *supra*), it is apparent to us that it was not the intent of the County Council to draw a distinction between public rights-of-way held in fee simple and those by easement.

It would be contrary to a cardinal tenet of legislative interpretation principles, i.e., avoidance of a nonsensical construction, to conclude that the Council intended to restrict improvements only within public rights-of-way held in easement, but not those held in fee simple. The contretemps over whether the interest in land conveyed to the Railroad

---

(Continued…)

In *Read*, the Court of Special Appeals drew a distinction between land granted to a railroad by Congress and land acquired privately in fee simple. *Read*, 101 Md. App. at 72, 643 A.2d at 480. "If the land to which appellants claim title was not acquired by the Railroads through a public grant, then it must be determined whether those portions, in which the Railroads acquired an interest in fee simple, were devoted to a public use." *Id.* Because *Read* was a case reaching the intermediate appellate court upon the grant of summary judgment in the trial court, the Court of Special Appeals concluded, in remanding the matter, that the answer to this question was, in the first instance, reserved for the trier of fact:

> whether there was a bona fide intent to preserve the right of way for actual railroad use, and the court could properly conclude that the acts and conduct of defendant were incompatible with the continued exercise of the easement, that the discontinuance of the line was not merely temporary, and that the right of way was abandoned and the easement terminated.

*Read*, 101 Md. App. at 72, 643 A.2d at 481 (citing *Maryland & Pa. R.R. v. Mercantile-Safe Deposit & Trust Co.,* 224 Md. 34, 41, 166 A.2d 247, 251 (1962)). In the present case, there remains nothing more for the trier of fact to resolve.

The 1890 Dunlop Deed shows that the purchase made by the Railroad was from a private landowner. There was no evidence adduced by Bhatt supporting a conclusion that

---

(…continued)

and the County as being fee-simple, not an easement, is but a "furiously-contested moot question," to borrow a well-turned phrase coined by Judge Moylan of the Court of Special Appeals (in *Holloway-Johnson v. Beall*, 220 Md. App. 195, 206, 103 A.3d 720, 727 (2014) *cert. granted,* 442 Md. 194, 112 A.3d 373 (2015)).

the right-of-way was abandoned and was not being used by the public, even during the period from 1985 when the freight service ended and 1988 when the property was conveyed to the County and became a hiker/biker trail as an interim public use. Rather, *Read* supports the County's argument because the Court of Special Appeals in *Read* concluded essentially that the railroad there was acting "as a quasi-public corporation, functioning to promote the public welfare." *Read*, 101 Md. App. at 68, 643 A.2d at 479. Although the railroad in *Read* was no longer operating trains on the right-of-way, the Court of Special Appeals concluded nonetheless that it was possible for the property to be considered as coming within the definition of "public use."

Relevant also to this particular inquiry, in 1983, Congress enacted the Rails-to-Trails Act to provide a different avenue for railroads that had ceased to operate, but did not intend to abandon its right-of-way as a public use. *Chevy Chase Land Co.*, 355 Md. at 163, 733 A.2d at 1084. Subsection (d) of 16 U.S.C. § 1247[10] provides another option

---

[10] The specific language of this section provides in relevant part:

[I]n furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, *such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.* If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be

(Continued…)

17

for railroad companies defending against potential contentions of abandonment. Recognizing that railroads held typically their rights-of-way under easements, "[b]y deeming interim trail use to be like discontinuance rather than abandonment, Congress prevented property interests from reverting under state law." *Preseault v. I.C.C.*, 494 U.S. 1, 8, 110 S. Ct. 914, 919-20 (1990) (internal citation omitted). When a railroad track is considered for interim trail use, "the rail corridor is held in a national 'rail bank,' over which federal regulators retain jurisdiction for the possibility of future rail use." *Chevy Chase Land Co*, 355 Md. at 166, 733 A.2d at 1085.

To show abandonment, a claimant must show "an intention to abandon, and an overt act, or an omission to act, by which such intention is carried into effect." *Cooper v. Sanford Land Co.*, 224 Md. 263, 266, 167 A.2d 602, 604 (1961). To determine whether a party intended to abandon a rail line (and, therefore, the public use), the inquiry should be:

> If it were to be found that the contemplated use were within the scope of the easement this could be evidence of a lack of intention to abandon. If the contemplated use were not within the scope of the easement, then unless it be found that some other permitted use is being made, it is possible that an intention to abandon might be found, although if the

---

(…continued)

> levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

16 U.S.C § 1247(d) (emphasis added).

contemplated use is found not to be within the scope of the easement this would not necessarily establish an intention to abandon.

*Peck v. Baltimore Cnty.*, 286 Md. 368, 377-78, 410 A.2d 7, 11 (1979). Non-use alone is not sufficient to constitute abandonment. *See Shuggars v. Brake,* 248 Md. 38, 46, 234 A.2d 752, 758 (1967). Because the general rule requires that a right-of-way be used for the purpose for which it was granted, relevant to the determination of an intent to abandon is the nature of the grant:

> [I]f the scope of the easement were limited to railroad purposes, then an intent to abandon railroad use could indicate an intent to abandon the easement. However, the converse is also true. If the easement is not limited in its scope to railroad purposes, then, in order for there to be an abandonment, the party alleging abandonment must show more than an intent to abandon railroad service.

*Chevy Chase Land Co.*, 355 Md. at 157-58, 733 A.2d at 1080.

In *East Washington Railway Co.,* 244 Md. 287, 223 A.2d 599 (1966), our predecessors concluded that the right-of-way was subject to adverse possession due to abandonment. The conveyance from the private landowner to the railroad company granted plainly "an easement for *railway purposes and use only*." *East Washington Ry. Co.*, 244 Md. at 294, 223 A.2d at 603 (emphasis added). Any use other than for railroad purposes would be beyond the scope of the grant. The right-of-way "reverted to its original owners or their successors in title, because the railroad intentionally abandoned the present and future use of the contested strip for railroad purposes." *Id.* The specific nature of this conveyance showed an intent to abandon once it was no longer being used for railroad purposes, which allowed the property to be subject to adverse possession.

19

In *Chevy Chase Land Co.*, the "grantee railroad [wa]s obligated under statutory and common law to operate and use its assets for the furtherance of the general public welfare [and we concluded that] the conversion of a railway used for freight to a footpath [wa]s consistent and compatible with the prior railway use." *Chevy Chase Land Co.*, 355 Md. at 156, 733 A.2d at 1080. "Use of the right-of-way as a hiker/biker trail constitute[d] a change in instrumentality. . . from railcars to bikes and walking, [but] our highway cases make clear that changes in mode of use are presumed to be within the contemplation of the parties." *Chevy Chase Land Co.*, 355 Md. at 151, 733 A.2d at 1077. Furthermore, with no limitations placed in the deed, the transition from railway to hiker/biker trail was not beyond the scope of the interest granted via the right-of-way in *Chevy Chase Land Co.*

The same is true here and is what makes the present case differ from *East Washington*. The right-of-way granted to the Railroad (and Montgomery County subsequently) by the 1890 Dunlop Deed was a general conveyance that placed no restriction on its use. Thus, the transition from railway to interim hiker/biker trail is a reasonable public use of the right-of-way and well within the County's rights to establish. Under the Rails-to-Trails Act, this transition from rail travel to a footpath would not constitute abandonment.[11] If an abandonment analysis were undertaken, Bhatt would

_____

[11] Railroads are subject to federal regulations because railroads operate in interstate commerce. Abandonment of railroad lines and service are also controlled by federal law. 49 U.S.C. § 10903. Under this specific federal provision, a rail carrier must file an application for abandonment and thus non-use would not be sufficient:

(Continued…)

20

have to present specific evidence on this question, which he has failed to do before any court in this case.

The right-of-way in question was subject to the rails-to-trails program, as it was located on the Georgetown Branch/Capital Crescent Trail and subject to a Certificate of Interim Trail Use. As we concluded in *Chevy Chase Land Co.*, "when a railroad takes actions pursuant to federal regulation that are wholly consistent with an intent to retain the property interest, in this case in order to pursue an interim trail use agreement, those actions alone cannot supply the decisive and unequivocal act evidencing an intent to abandon." *Chevy Chase Land Co.*, 355 Md. at 182, 733 A.2d at 1094. The conveyance accomplished by the 1890 Dunlop Deed to the Railroad did not restrict the use of the property to "railroad purposes." Furthermore, it is apparent that the succeeding interim use as a hiker/biker trail is within the accepted definition of "public use" and within the scope of the grant to the Railroad and ultimately to the County. The inclusion of this portion of the Georgetown Branch in the Federal Rails-to-Trails "rail bank" is a further

---

(…continued)

> (1) A rail carrier providing transportation subject to the jurisdiction of the Board under this part who intends to--
> > (A) abandon any part of its railroad lines; or
> > (B) discontinue the operation of all rail transportation over any part of its railroad lines,
> must file an application relating thereto with the Board. An abandonment or discontinuance may be carried out only as authorized under this chapter.

49 U.S.C. § 10903(a). Because rail lines that are covered under a rails-to-trails agreement are subject to a future restoration of rail use, the right-of-way is not subject to a regulatory abandonment.

21

indication that there was no intent to abandon the right-of-way as a public use.

Because no evidence was presented by Bhatt to show that the current use of the right-of-way by Montgomery County is unreasonable or that the Railroad or the County abandoned the right-of-way, no claim for adverse possession will lie. Accordingly, we shall reverse the judgment of the Circuit Court. Bhatt's fence and shed encroached upon the right-of-way in violation of Montgomery County Code § 49-10(b).[12] The District Court got it right.

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE DISTRICT COURT OF MARYLAND, SITTING IN MONTGOMERY COUNTY. COSTS IN THIS COURT AND THE CIRCUIT COURT TO BE PAID BY RESPONDENT.**

---

[12] The County, in its Reply Brief filed with this Court, raised an argument not contained in its Petition for Writ of Certiorari nor raised or decided in the trial courts, to wit: the Circuit Court lacked jurisdiction to consider Bhatt's adverse possession defense as it was preempted by federal law. *See* 49 U.S.C. § 10903. We do not recognize nor reach this jurisdictional argument because it was not raised and decided below, nor was it encompassed within our writ of certiorari. *See* Md. Rule 8-131(b)(1) (when reviewing a decision made by a circuit court acting in its appellate capacity, "the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals"). In any event, a failure to consider this argument is of no consequence, inasmuch as the County prevails on the merits.