No. 119,605

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CENTRAL KANSAS CONSERVANCY, INC.,
*Appellee*,

v.

CLINTON L. SIDES and KIMBRA D. SIDES,
*Appellants*.


SYLLABUS BY THE COURT

1.

A trail created under the National Trails System Act (Trails Act), 16 U.S.C. § 1247(d) (2012) cannot be adversely possessed. Nor can portions of the trail be obtained by prescriptive easement. These trails exist for public use. Thus, K.S.A. 60-509 exempts Trails Act trails from the application of adverse possession and prescriptive easement statute of limitations.


2.

When determining if the party responsible for a Trails Act trail must comply with K.S.A. 58-3213 of the Kansas Recreational Trails Act (KRTA), subsection (d) requires consideration of the date the appropriate federal agency originally approved the railroad and potential responsible party for interim trail use. If the appropriate federal agency approved the railroad and potential responsible party for interim trail use before the KRTA's effective date, the current responsible party has no obligation to comply with the requirements under K.S.A. 58-3213.


3.

Under the plain language of K.S.A. 58-3213(d), it is irrelevant whether the party the appropriate federal agency originally approved to negotiate for interim trail use is the same as the current responsible party maintaining the trail.

1

4.

K.S.A. 2018 Supp. 58-3215 establishes that when a responsible party violates the KRTA, enforcement of the KRTA is the only available remedy for an aggrieved party.

5.

The party responsible for the trail and the adjacent property owner will split the costs of fencing as stated under K.S.A. 58-3212(a)(10)(D) only when the adjacent property owner does not have the remaining sides of his or her property fenced as stated under K.S.A. 58-3212(a)(10)(C).

6.

Deterioration of a fence does not necessarily exempt the party responsible for the trail from K.S.A. 58-3212(a)(10)(A)'s requirement to maintain fencing already in place along the railroad corridor. The key is if the fence still "exists" and can therefore be maintained.

7.

The plain language of K.S.A. 58-3212(a)(10) underscores that fencing constructed on a trail created under the Trails Act must be constructed on the partition line.

8.

Because the party responsible for a trail has a statutory duty to construct fencing along the trail, the responsible party has the privilege to enter the adjacent landowner's property when constructing partition fencing.

Appeal from McPherson District Court; MARILYN M. WILDER, judge. Opinion filed May 17, 2019. Affirmed in part, reversed in part, and remanded with directions.

*Patrick B. Hughes*, of Adams Jones Law Firm, P.A., of Wichita, for appellants.

2

*Casey R. Law*, of Wise & Reber, L.C., of McPherson, and *Michael T. Mills*, of Michael T. Mills, Chartered, of McPherson, for appellee.

*Terry D. Holdren* and *Wendee D. Grady*, of Kansas Farm Bureau, of Manhattan, and *Aaron Popelka* and *Tucker Stewart*, of Kansas Livestock Association, of Topeka, amici curiae.

Before GREEN, P.J., SCHROEDER, J., and STUTZMAN, S.J.

GREEN, J.: This case involves a .75-mile stretch of railroad corridor which runs on Clinton L. Sides and Kimbra D. Sides' property in McPherson County, Kansas. The railroad corridor at issue, along with the railroad corridor running north and south of it, have been converted to a trail use easement under the National Trails System Act (Trails Act), 16 U.S.C. § 1247(d) (2012). The Central Kansas Conservancy, Inc. (Conservancy) owns the trail use easement. As a result of this easement, it intends to develop the railroad corridor into a public trail named the "Meadowlark Trail."

Below, the Sides unsuccessfully challenged the Conservancy's ownership of the trail use easement. The Sides now appeal the trial court's rulings against them, arguing that the trial court's decision to grant the Conservancy's request for quiet title was erroneous for two reasons. First, they argue that they obtained rights over the railroad corridor to the exclusion of the Conservancy through adverse possession or prescriptive easement. Second, they argue that the Conservancy's right to develop the trail no longer exists because the Conservancy violated K.S.A. 58-3213(c) of the Kansas Recreational Trails Act (KRTA). Finally, the Sides argue that the trial court's decision to grant the Conservancy's injunction, which contained rulings about fencing, was erroneous because it contravened the plain language of K.S.A. 58-3212(a)(10).

We determine the Sides' arguments—that they obtained rights over the railroad corridor through either adverse possession or prescriptive easement and that the

3

Conservancy's lack of compliance with K.S.A. 58-3213(c) caused it to lose the right to develop the trail—are unpersuasive. Nevertheless, we determine the Sides' arguments about fencing have merit. In short, we conclude that the Conservancy owns the trail use easement and has the right to develop the rail corridor into a trail. But under the facts of this case, we conclude that the trial court did not follow the plain language of K.S.A. 58-3212(a)(10) when it made its fence rulings. As a result, we affirm in part, reverse in part, and remand with directions consistent with this opinion.

On April 16, 1997, in accordance with the Trails Act, Union Pacific and the Conservancy entered into a line donation contract, where Union Pacific gave the Conservancy a "Donative Quitclaim Deed" to its easement rights over 12.6 miles of railroad corridor in McPherson County. As a result, absent future railbanking, the Conservancy obtained the exclusive right to develop the railroad corridor for recreational trail use. About .75 miles of this railroad ran through the Sides' land; the railroad corridor was about 66 feet wide.

On September 10, 2015, the Conservancy petitioned the McPherson County District Court for quiet title and an injunction concerning its trail use easement on the Sides' land.

In its petition, the Conservancy alleged that after it obtained the trail use easement, the Sides "actively and unlawfully interfered with [its] lawful attempts . . . to exercise [its] rights to use and further develop, and to perform its duties with respect to the use and further development of, the Corridor as a recreational trail." Additionally, the Conservancy asserted that the Sides had blocked its access to the railroad corridor with fencing and "machinery and equipment," with no intention of stopping.

The Sides responded, agreeing that they had blocked the railroad corridor with fencing. They also agreed that they had placed equipment and machinery in the railroad

4

corridor that prevented the Conservancy from entering it. But the Sides asserted that their interference with the Conservancy's right to enter the railroad corridor constituted adverse possession of the Conservancy's ownership of the corridor. Alternatively, they argued that they had obtained a prescriptive easement over the railroad corridor. Moreover, the Sides asserted that the Conservancy's "opportunity to develop and use the railroad right of way for a recreational trail had to be exercised, if at all, within two years of the expiration of the appeal period . . . ." The Sides believed that the Conservancy violated K.S.A. 58-3213(c) of the KRTA's two-year period to develop a trail. As a result, the Sides requested that the trial court not only deny the Conservancy's petition but also grant their counterclaims for quiet title, declaratory judgment, and injunction.

The trial court held a case management conference on March 21, 2016. After this conference, the parties filed multiple competing summary judgment motions. Those competing motions can be summarized as follows:

The Sides argued that they were entitled to summary judgment against the Conservancy, and in favor of their counterclaims, for the same reasons they listed in their response—they adversely possessed the railroad corridor, they obtained a prescriptive easement over the railroad corridor, and the Conservancy violated K.S.A. 58-3213(c).

For their adverse possession and prescriptive easement arguments, the Sides stressed that in addition to the fencing, machinery, and equipment, since the mid-1990s they had farmed, grazed cattle, and hunted on the railroad corridor. Then, the Sides cited federal law holding that recreational trail use does not fall within the original scope of a railroad easement. Thus, the Sides asserted the trail use easement constituted a new easement that they could obtain rights over by adverse possession or prescriptive easement.

5

For their argument that the Conservancy violated K.S.A. 58-3213(c)'s two-year time limit, the Sides alleged that these facts were uncontroverted: (1) that the Conservancy had begun planning the construction of the trail on October 14, 1997; (2) that the Conservancy had not physically developed the trail within two years "following the time to appeal from the [Conservancy's] acquisition of the right to develop [the] recreational trail"; (3) that the Conservancy first contacted them about physically developing the trail on the railroad corridor running through their land in August 2013; and (4) that the Conservancy had still not physically developed the trail on the railroad corridor running through their land.

Last, under K.S.A. 58-3212(a)(9) of the KRTA, the Sides argued that they had "crossing and use rights [over the railroad corridor] even if the [Conservancy was] otherwise empowered to construct a trail and [they had] neither adverse possession nor a prescriptive easement."

In its motion, the Conservancy argued that the trial court should grant summary judgment in its favor on the issues of quiet title and injunction because the uncontroverted facts established that it had an easement over the railroad corridor. The Conservancy also argued that the Sides' arguments were flawed based on the following: (1) because the "public use" exception under K.S.A. 60-509 prevented the Sides from acquiring additional rights over the railroad corridor through adverse possession or prescriptive easement; (2) because K.S.A. 58-3213(c)'s two-year time limit did not apply given the plain language of K.S.A. 58-3213(d) and the facts of the case; and (3) because the Sides sought a remedy that was unavailable under the KRTA given the plain language of K.S.A. 2016 Supp. 58-3215.

As for K.S.A. 58-3213(c)'s two-year time limit, the Conservancy pointed out that the Interstate Commerce Commission (ICC) served its first Notice of Interim Trail Use (NITU) on September 28, 1995, when Union Pacific and the City of Lindsborg, Kansas,

6

entered into negotiations. Meanwhile, K.S.A. 58-3213 went into effect on July 1, 1996. Thus, the Conservancy argued that it was exempt from complying with K.S.A. 58-3213(c) because the ICC approved NITU negotiations before the KRTA went into effect. See K.S.A. 58-3213(d).

On October 12, 2016, the trial court denied the Sides' motion for summary judgment. It granted the Conservancy's motion in part. In its order, the trial court made the following factual findings:

"[1].   The Union Pacific Railroad acquired a railroad right of way over the Subject Property in the late 1800s. The parties do not agree as to whether the right of way was acquired by condemnation or purchase but have not made the manner of acquisition an issue in their motion for summary judgment.

"[2].   On June 5, 1995, Union Pacific sought an exemption from the [ICC] to abandon 12.6 miles of rail line between milepost 518.0 and 530.6 near Lindsborg, all in McPherson County. A portion of that rail line traverses the Subject Property. Union Pacific certified at that time that no local traffic had moved [on] the line for at least two years. (The [ICC's] functions has been transferred to the successor body, the [STB].)

"[3].   The railroad right-of-way/trail corridor is 66 feet in width and runs generally north and south.

"[4].   On August 18, 1995, the City of Lindsborg, Kansas requested that a [NITU] be issued for the subject rail line under the National Trails System Act, 16 U.S.C. 1247(d).

"[5].   On September 20, 1995, the [ICC] issued a Decision and Notice of Interim Trail Use or Abandonment allowing for negotiation of an interim trail use/rail banking agreement.

"[6].   On March 25, 1997, the STB issued a Decision that recited various extensions of the trail use condition and the various parties that participated in obtaining those extensions, ultimately ending with the Plaintiff, Central Kansas Conservancy, Inc., and granted Plaintiff's request to extend the interim trail use negotiation period to April 20, 1997, thereby allowing Plaintiff to continue to negotiate a trail use/rail banking agreement with UP.

7

"[7]. On April 16, 1997, Plaintiff reached an agreement with Union Pacific for use of rights-of-way, including the right-of-way over the Subject Property, for trail purposes. This agreement was embodied in a Line Donation Contract meeting the conditions of 16 U.S.C. 1247(d). The Line Donation Contract provided in part 'In the event reactivation of rail service upon the Property is necessary, Donee agrees to transfer the Property back to UP by executing a quit claim deed in recordable form.'

"[8]. On April 16, 1997, Union Pacific Railroad provided Plaintiff with a Donative Quit Claim Deed to, *inter alia,* the right-of-way over the Subject Property, subject to the April 16, 1997 Line Donation Contract and the terms and conditions of the ICC Decision and Notice of Interim Trail Use in Docket AB-33. On May 30, 1997, Union Pacific Railroad provided Plaintiff with a Correction Donative Quit Claim Deed to, *inter alia,* the right-of-way over the Subject Property, subject to the April 16, 1997 Line Donation Contract and the terms and conditions of the ICC Decision and Notice of Interim Trail Use in Docket AB-33.

"[9]. The Defendants obtained a portion of the Subject Property by warranty deed dated December 17, 1994 and leased the grass portion adjoining the then unused railroad right-of-way running through that quarter section. At that time there was no current railroad-related activity evident on the right of way. (No written lease was provided to the Court so the Court makes no determination regarding the validity or terms of that lease.)

"[10]. Defendants acquired additional property adjoining on both sides the right-of-way by warranty deed dated December 17, 1997, and on August 24, 2000 acquired additional property also subject to the right-of-way.

"[11]. By warranty deed dated July 2, 2001, Defendants acquired the remainder of the property in the southeast quarter of Section 29, Township 18 South, Range 3 West of the Sixth P.M. that they had not acquired in the previous transactions.

"[12]. Since the mid-1990s, access to the Subject Property from Pawnee Road on the south, and from the north, has been fenced off by [the Sides]. In addition, [the Sides] erected 'no trespassing' signs on the fence blocking access to the Subject Property and have parked farm equipment on the Subject Property to further block access from Pawnee Road.

"[13]. The [KRTA], K.S.A. 58-3211 *et seq.* was passed into law by the Kansas legislature and was effective as of July 1, 1996."

8

Based on the preceding facts, the trial court rejected each of the Sides' arguments. First, the trial court rejected the Sides' arguments that they could obtain rights over the railroad corridor to the exclusion of the Conservancy through adverse possession or prescriptive easement. The trial court held that under K.S.A. 60-509, Kansas law prevented the taking of lands held for public use. The trial court ruled that railbanking easements and trail use easements constituted easements for public use based on the United States Supreme Court decision in *Preseault v. I.C.C.*, 494 U.S. 1, 19, 110 S. Ct. 914, 108 L. Ed. 2d 1 (1990). Second, the trial court ruled that K.S.A. 58-3213 of the KRTA, including K.S.A. 58-3213(c)'s two-year time limit on trail development did not apply. The trial court noted that K.S.A. 58-3213(d) stated that the section applied only to "recreational trails for which approval to enter into negotiations for interim trail use [was] received from the appropriate federal agency on or after the effective date of [the] act." Yet, the ICC approved the Union Pacific's and Lindsborg's negotiations for NITU on September 20, 1995, before K.S.A. 58-3213's enactment on July 1, 1996.

Next, the trial court determined that the Sides' argument about whether they had a right to use the railroad corridor under K.S.A. 58-3212(a)(9) was not properly before the court. The trial court found that because the parties had not "elucidated the rights of [the] landowners in respect to a trail easement," the court would not make "findings on that issue." The trial court would later speculate that "there would seem to be no reason why the [Sides] couldn't . . . [continue] to store machinery on the [railroad corridor] until the time that [the Conservancy was] ready to begin work on the [corridor]." Yet, the trial court barred the Sides from excluding the Conservancy by posting no trespassing signs, fencing, or in any other way, as it started to develop the trail.

On July 10, 2017, upon the request of the parties, the trial court clarified its summary judgment order. The trial court stated that it denied the Sides' motion for summary judgment in all respects. Next, the trial court stated that although it granted the

Conservancy's summary judgment motion on quiet title, it denied the Conservancy's summary judgment motion on the injunction.

After entering this order, the parties filed several motions debating whether the Sides had a right to access the corridor. The Conservancy also alleged that the Sides (1) were seeking to relitigate issues that the trial court had already decided against them and (2) were actively interfering with its construction of the trail, enhancing its need for the injunction.

On July 21, 2017, the Conservancy sent a letter to the Sides' counsel stating that it intended to "work on the Trail" running through the Sides' property sometime between July 26 and 29, 2017, and on August 5, 2017. When Conservancy volunteers arrived at the disputed corridor on July 26, 2017, they found that the Sides had placed a new large piece of farm equipment and a mobile home frame on the railroad corridor. On August 5, 2017, Conservancy volunteers were denied access to the railroad corridor. As a result, the Conservancy moved for a "permanent prohibitory injunction and permanent mandatory injunction," arguing that the Sides' actions prevented it from developing the trail and violated the court's previous order.

The Sides responded that they had violated no court order, because at that time, "[a]ll the Court ha[d] done [was] issue non-final rulings on partial motions for summary judgments, which [were], by their nature, subject to revision until they [were] made final decisions." The Sides argued that the Conservancy's injunction requests were overly broad.

Next, the Sides retracted their request for a crossing easement under K.S.A. 58-3212(a)(9). The Sides explained they were not requesting an easement under K.S.A. 58-3212(a)(9) because they had not yet requested the crossing easement from the Conservancy, which they believed was a prerequisite for the easement.

10

Ultimately, the parties' remaining arguments were set for trial. Before trial, they submitted trial briefs.

The Conservancy stated that the theory of its case was that it "should receive a permanent mandatory and prohibitory injunction to enforce its rights to improve the Dispute[d] Corridor and to open it as a recreational trail." The Conservancy argued that the trial court must answer these questions of fact at trial: (1) whether the Sides interfered with the Conservancy's ability to build a public recreation trail on the rail corridor; and (2) whether the Sides would continue to interfere with the Conservancy absent an injunction.

The Sides stated that the theory of its case was that the Conservancy had "no right to develop or use [their] property for a recreational trail and/or [was] not entitled to injunctive relief for such purposes having failed to commence or complete the development, and having failed to bring an action seeking access to the subject property, in a timely way." The Sides alleged that they had rights as the owners of the servient estate to use the railroad corridor as long as they did not unreasonably interfere with the Conservancy's "actual and appropriate use of . . . easement rights." For this reason, they argued that the Conservancy was not entitled to an injunction or, alternatively, not entitled to an injunction that would restrict their exercise of "legitimate . . . property rights." The Sides also requested that the trial court order an injunction preventing the Conservancy from (1) entering the railroad corridor and (2) "opening the trail" because the Conservancy had not maintained fencing as required under K.S.A. 58-3212 of the KRTA. The Sides asked the trial court to amend its pleadings consistent with its current arguments.

Under the assumption the trial court granted the Conservancy's injunction, the Sides argued that "[a]ny injunction must address fencing obligations . . . ." This included

11

information about the location, construction, and materials of the fence. The Sides argued that K.S.A. 58-3212(a)(10) of the KRTA mandated that the Conservancy "erect fencing at its cost on both sides of its trail." Moreover, the Sides argued that the Conservancy must locate the fence in a way that preserved their access to "use a significant portion of the 66-foot right-of-way width for grazing, hunting, raising crops or other reasonable uses" because "(1) the KRTA does not require fencing of the boundaries of the railroad right-of-way . . . [and] (2) the [Conservancy] does not plan to build a trail 66-feet wide."

The parties' bench trial took place over 4 days in January, February, and May 2018. Over the course of those 4 days, 12 people testified.

Regarding fencing, Clinton Sides testified that when he and Kimbra bought the land encompassing the railroad corridor in 1997, "[t]here [were] old remnants of . . . fencing along the railroad right-of-way that would not keep anything in and it was [in a state of] disrepair and not used." Clinton asserted that on the right-of-way, you may "find a post here and there," and you may "find five-barb wires that are in disarray and on the ground in places, but there [was] not a fence that [would] hold livestock in." Clinton explained that he let his cattle graze on the railroad corridor. Thus, he admitted that he benefitted from the Conservancy not being on the railroad corridor. But he testified that if the court allowed the Conservancy to develop the trail, he "expect[ed] a fence to be put on [the] easement to keep [his] cattle off [of] it."

Moreover, Clinton testified that he had a barbed wire fence around the entirety of his property, which he had reinforced with an electric fence. He also explained that he placed a barbed wire and electric fence across the easement in 2000 when he started noticing people walking down the easement. Clinton claimed that he placed this fence on the easement before the Conservancy posted no trespassing signs. Clinton admitted that he did not take this fence down for Conservancy volunteers to work on the trail. Instead, those volunteers had to use a ladder to crawl over the fence when they worked on the trail

12

on July 26, 2017. Clinton asserted that on August 5, 2017, "law enforcement" would not let Conservancy volunteers on "[his] property." He admitted that he told Michele Cullen, the Conservancy's president, that he was "not going to allow her on [his] personal property to destroy trees and grass that day." The trees and grass Clinton referred to were within the railroad corridor.

Cullen explained that most other landowners next to the Meadowlark Trail were "growing crops and they actually go right up to the right-of-way on either side and don't own property on both sides and they do encroach on our right of way." She testified that the Sides were the only landowners who had requested fencing given that most landowners were encroaching the Conservancy's right-of-way. But she explained that if the Sides wanted a fence, or if the Conservancy had to fence given the Sides' cattle, the Conservancy would construct a fence.

Cullen testified that the Conservancy "could not make plans as to what [it was] going to do for fencing until [it] had a meeting with [Clinton] and decided between [Clinton] and [the Conservancy] what was needed." When questioned whether the Conservancy ever maintained the existing fencing on the railroad corridor, Cullen testified that the Conservancy had not maintained such fencing. Cullen also testified, however, that the Sides never asked the Conservancy to maintain any existing fencing. Furthermore, Cullen testified that Clinton told her the Conservancy could not do any work on the railroad corridor "[w]ithout a court order."

Cullen explained the Conservancy's plans for the Meadowlark Trail. At first, the Conservancy intended to make the trail a category 1 or 2 trail. This meant that the trail would be a single lane that extended the "whole width of the flat part of the railroad bed." But eventually, the Conservancy wanted to enhance the trail by adding more benches and a horse path next to the trail. Cullen testified that if a fence was built, the Conservancy would construct it on the edges of the right-of-way because that was what the

13

Conservancy was "entitled to." Additionally, she testified that so far, no landowner had requested a crossing easement under the KRTA.

David McMannis, a fence contractor who testified on the Sides' behalf, testified about providing the Sides with a fencing estimate. McMannis testified that he generally constructs barbed wire fences. McMannis stated that the Sides requested an estimate for "a five-wire barbed wire fence with a post approximately every 10 feet," with three gates. He explained that at one point Clinton asked him, "Can you fence this and not get on [my] property?" According to McMannis, he did not have the equipment or manpower to construct the fence from the railroad corridor alone. McMannis also explained that the railroad corridor was too steep, and he needed a flat working area. McMannis asserted that to construct the fence from inside the railroad corridor alone would require him to work by hand, which would cost more money.

In the end, the trial court rejected the Sides' argument that the Conservancy was barred from using its easement. It noted that it had already ruled on this issue in its summary judgment order. It then explained:

> "The relief granted under KRTA is for the Court to order compliance. *See,* K.S.A. 58-3215. [The Sides] could have filed a counter-claim in this litigation to more fully litigate their allegations of [the Conservancy's] failure to comply with KRTA; however, Mr. Sides testified he does not want a court order for [the Conservancy] to comply with KRTA, the remedy provided by KRTA."

As for the Conservancy's compliance with the KRTA, the trial court found that "under a strict reading of [K.S.A. 58-3212(a)(10)], [the Conservancy] ha[d] not maintained any existing fence since it received its easements in 1997 nor has it installed any fencing along the right-of-way." Yet, it also found that "there was no evidence that any landowner ever made a serious request for fencing that had been ignored by [the Conservancy]." The trial court noted that Clinton "testified repeatedly that he [did not]

14

want [the Conservancy] on 'his' property and that he 'owned' the right of way or that he 'had the deed' to the right of way." Based on the preceding, the trial court held:

"[I]f no landowner is requesting maintenance or installation of fencing or will allow [the Conservancy] on the property to maintain or install fencing, it is hard to see how [the Conservancy] is failing in its duty. Put another way, if no landowner seems to want fencing along the right of way or is willing to pay half the cost of such fencing, how is it a breach of duty for Plaintiff not to provide fencing?"

Next, the trial court made findings and rulings about the opposition the Conservancy faced in constructing the trail, the Conservancy's ability to construct the trail, and fencing:

"28.    Evidence at trial showed plainly and quite clearly that [the Conservancy] has faced opposition at the local level and in various legal proceedings throughout the 21 years it has held the right of way. Landowners have removed signs posted; erected barbed wire fences across the trail on both developed and undeveloped portions of the trail; made complaints to the McPherson Board of County Commissioners, successfully urging them to complain to the [STB]; some landowners involved themselves at the Kansas Board of Tax Appeals; and two separate actions were filed with the [STB] seeking revocation of the right-of-way agreement. A Request to Re-open one of those proceedings was also filed by landowners. The landowners, specifically including [the Sides] in this case, simultaneously now complain of lack of action and complained and interfered in the past when [the Conservancy] attempted to fulfill its statutory obligations, including weed control and others. Given the amount and types of opposition, it is no wonder that [the Conservancy] has clearly had difficulty meeting the letter of the law in [the] KRTA. That is not equivalent, however, to finding that [the Conservancy] has failed to follow the KRTA nor that [the Conservancy] has used the right of way in a manner that presents a public nuisance.

. . . .

"34.    The evidence is that the trail across the [the Sides'] property would be developed similarly to the other phases of the developed trail. Although the actual trail

15

would only be eight to ten feet in width, there is nothing in the law that limits [the Conservancy] to use of only that much of the right-of-way. Kansas case law does allow a servient land owner to make use of a railroad right-of-way in any way that is not inconsistent with the railroad's use; however, [the Sides] have declined to name any specific use they would make of the right-of-way not 'needed' by [the Conservancy]. By way of example, all parties seem to agree that cattle should not be near the walking path or people so it would not be appropriate to allow [the Sides] to pasture cattle right up to the edge of a walking trail eight to ten feet in width. Similarly, there is no evidence that there is tillable ground near the right of way so [the Sides] can't claim a need or desire to farm that particular ground. Because [the Sides] fail to identify any specific use they wish to make of the right-of-way that [is] under the control of [the Conservancy], there is no need to limit [the Conservancy's] use of the right-of-way which it has been granted through the [STB]. The Court cannot find, based upon the evidence at trial, that [the Sides] are entitled to any use of the right-of-way.

. . . .

"40.    As stated previously, the evidence is clear that [the Conservancy] has shown it is ready, willing and able to begin development of the trail across [the Sides'] property and, additionally, [the Conservancy] has shown an irreparable injury. [The Conservancy] cannot proceed to do the work it is legally entitled and required to perform on the easement it has been granted because [the Sides] are insistent, wrongly, that they own the easement. They have made known to [the Conservancy] that [the Conservancy] is not to be on 'their" property and have placed barriers to [the Conservancy] doing its work. [The Conservancy] has shown that it has the capacity to develop an additional .75 miles of trail but is prevented from doing so by the actions of [the Sides]. [The Sides] even alluded to continuing their opposition to any work on the trail while the matter is appealed. These facts scream for an injunction against [the Sides].

"41.    The Court agrees with [the Sides] that public interest is served by requiring [the Conservancy's] compliance with the KRTA; however, [the Sides] have stated they actually do not want the [the Conservancy] to comply with the KRTA and specifically did not file an action to that end because the stated remedy in such an action is a compliance order. [The Conservancy's] requested injunction against the [the Sides] will actually allow the [the Conservancy] to comply with the

16

KRTA as it relates to the easement over [the Sides'] land, free of interference by [the Sides].

. . . .

"44.    The KRTA does not require [the Conservancy] to bear the full cost of fencing along the right of way. KRTA requires [the Conservancy] to pay one-half of the cost of fencing. There were no arguments or evidence presented to the Court that any other fencing statutes apply to this case. If [the Sides] request fencing from [the Conservancy], [the Sides] are obligated under the KRTA to pay one-half-of the cost of that fencing."

As a result, the trial court granted the Conservancy's request for an injunction. The trial court held that the evidence established the Sides "[would] not allow [the Conservancy] to enter the right-of-way upon which [the Conservancy was] entitled to develop a trail without a court order." The trial court found that the Sides violated its summary judgment orders when they prevented the Conservancy from working on the trail in July and August 2017. And the Sides' decision to violate its order supported the injunction ruling.

Then, the trial court ordered the following as part of the injunction:

"As a further condition of this injunction, [the Conservancy] is ordered to contact [the Sides] within thirty (30) days of the date of this ruling to discuss an appropriate barbed wire fence along both sides of the right-of-way to keep cattle from escaping from [the Sides'] property. If [the Sides] require a survey to determine the placement of the fence, that survey shall be paid for by [the Sides]. [The Sides] shall further be required to pay their one-half of the cost of fencing prior to the beginning of the construction of the fence and the fence builder or appropriate volunteer fence builders shall be allowed reasonable access to [the Sides'] property as necessary to install the appropriate fence. If [the Sides] so request, they shall be allowed one crossing with appropriate gates. Construction of the fence shall commence within thirty (30) days of any survey required by [the Sides]. [The Conservancy] is not required to hire a professional fence builder unless it so chooses."

17

*Does This Court Have Jurisdiction?*

After both the Sides and the Conservancy had already filed their briefs in this case, the Conservancy moved this court to dismiss for lack of jurisdiction the Sides' claims on adverse possession, prescriptive easement, and K.S.A. 58-3213(c)'s two-year period to develop a trail. Thus, the Conservancy argued that this court had jurisdiction over only the Sides' fencing-related arguments. The Conservancy argues that this court lacks jurisdiction because "when the district court refused in its July 2017 'Decision' to foreclose a possible future grant of injunctive relief to [the Conservancy], that refusal did not prevent the July 2017 Decision from being final for appeal purposes." Because the Conservancy believes the trial court's summary judgment ruling was final as to the quiet title rulings in July 2017, the Conservancy argues that the Sides' June 11, 2018 notice of appeal was untimely.

This court exercises unlimited review when considering whether jurisdiction exists. *In re Care & Treatment of Emerson*, 306 Kan. 30, 34, 392 P.3d 82 (2017).

The Conservancy relies on this court's holding in *Thompson-Hayward Chem. Co. v. Cyprus Mines Corp.*, 8 Kan. App. 2d 487, Syl. ¶ 5, 660 P.2d 973 (1983), to support its proposition. In *Thompson*, this court held:  "An action to enjoin the breach of a contract is not based upon the same cause of action as a subsequent action for damages resulting from the breach and is thus not a res judicata bar to the subsequent action." Although not relevant to the remainder of this appeal, the Conservancy emphasizes that it initially requested damages against the Sides but it withdrew its damages request after the trial court granted its quiet title request.

Unlike in *Thompson*, however, the Conservancy brought its claims of quiet title, injunction, and damages in the same petition. As a result, this case involves one cause of action, not a first cause of action and later cause of action. Above all, regardless of the

18

fact the Conservancy voluntarily withdrew its request for damages, the trial court did not grant the Conservancy's request for summary judgment on its injunction claim in July 2017. The trial court decided the injunction issue following the bench trial. It is a well-known rule that "[a] partial summary judgment—one that disposes of fewer than all of the claims or issues between the parties—is not a final judgment." *Vallejo v. BNSF Railway Company*, 46 Kan. App. 2d 498, 503, 263 P.3d 208 (2011).

We note, however, on August 2, 2017, that the Sides moved the trial court to determine its summary judgment rulings as final under K.S.A. 2016 Supp. 60-254(b). Yet, nothing in the record on appeal, including the appearance docket, indicates that the trial court ever ruled on this motion. Furthermore, in its motion, the Conservancy never asserts that the trial court granted the Sides' K.S.A. 2016 Supp. 60-254(b) ruling, rendering the trial court's summary judgment rulings final and immediately appealable. During oral argument in this matter, the parties agreed that the trial court never granted the Sides' K.S.A. 2016 Supp. 60-254(b) motion.

As a result, the Sides did not need to appeal within 30 days of July 10, 2017, because the July 10, 2017 summary judgment order was not final. Instead, the Sides needed to appeal within 30 days of June 1, 2018—the date the trial court granted the Conservancy's injunction. Because the Sides appealed on June 11, 2018—10 days after the trial court's June 1, 2018 order granting the injunction—the Sides' appeal was timely.

Thus, this court has jurisdiction over this appeal.

*Did the Trial Court Err by Ruling That the Sides Could Not Obtain Possession of the Railroad Corridor by Adverse Possession or Prescriptive Easement?*

The Sides argue that the trial court erred when it ruled that they had not gained exclusive rights over the railroad corridor either through adverse possession or

19

prescriptive easement. The Sides contend that the trial court's finding that the Conservancy's easement constituted an easement for public use under K.S.A. 60-509 wrongly ignored that the Conservancy's trail use easement was distinct from Union Pacific's original railroad use easement.

In making their argument, the Sides cite federal caselaw supporting that the original railroad purpose easement and the recreational trail use easement are two distinct easements because those easements exist for different purposes. See *Anna F. Nordhus Family Tr. v. United States*, 98 Fed. Cl. 331, 338 (2011) (holding that under Kansas law, the use of a recreational trail on an interim basis on a railroad's former corridor constitutes no permissible railroad purpose, resulting in the creation of a new easement); see also *Toews v. United States*, 376 F.3d 1371, 1381 (Fed. Cir. 2004). The Sides emphasize that they seek to obtain rights over this new easement, not the railroad easement, by adverse possession or prescriptive easement.

The Sides also allege that the Conservancy's easement does not exist for public use. The Sides point out that the Conservancy is a private entity. They further point out that the Conservancy placed a no trespassing sign on the trail during the construction phase. According to the Sides, the preceding facts, coupled with their actions of openly using the railroad corridor since the mid-1990s, establish that the trial court erred when it denied their summary judgment motion.

The Conservancy responds that the trial court correctly determined that its recreational trail use easement over the railroad corridor exists for public use. The Conservancy alleges that the facts the Sides emphasize, like it being a private entity, are immaterial under K.S.A. 60-509.

20

*Standard of Review*

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, establish that no genuine issue of material facts exists and a moving party is entitled to judgment as a matter of law. *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018). When ruling on a summary judgment motion, the trial court must resolve all factual inferences in favor of the nonmoving party. 307 Kan. at 621. Summary judgment must be denied if reasonable minds could differ about the conclusions drawn from the evidence. 307 Kan. at 621.

The trial court denied the Sides' adverse possession and prescriptive easement arguments based solely on its construction and application of K.S.A. 60-509. Appellate courts exercise de novo review over the granting or denial of summary judgment motions when no facts are disputed. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).

*Trail for Public Use*

K.S.A. 60-503—the statute on adverse possession—states:

> "No action shall be maintained against any person for the recovery of real property who has been in open, exclusive and continuous possession of such real property, either under a claim knowingly adverse or under a belief of ownership, for a period of fifteen (15) years. This section shall not apply to any action commenced within one (1) year after the effective date of this act."

Kansas courts also "use the K.S.A. 60-503 elements for adverse possession in evaluating whether a prescriptive easement exists." *Brady Fluid Svc., Inc. v. Jordan*, 25 Kan. App. 2d 788, 794, 972 P.2d 787 (1998).

21

Nevertheless, K.S.A. 60-509 states that certain real property actions cannot be adversely possessed or obtained by prescriptive easement: "Nothing contained in any statutes of limitations shall be applicable to any real property given, granted, sequestered or *appropriated to any public use*, or to any lands belonging to this state." (Emphasis added.) Previously, this court has explained that real property for "public use" must be "owned or put to use by the public, or for the establishment of interests in such property." *City of Attica v. Mull Drilling Co.*, 9 Kan. App. 2d 325, 329-30, 676 P.2d 769 (1984). The *Attica* court explained: "To allow K.S.A. 60-509 to apply to all actions which in any manner concern publicly-owned or publicly-used property, no matter how nebulous, indirect or tangential the connection might be, would be extending the scope of that statute too far." 9 Kan. App. 2d at 329-30.

16 U.S.C. § 1247(d)—the Trails Act—states:

"The Secretary of Transportation, the Chairman of the Surface Transportation Board, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976, shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs. Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use."

22

Additionally, when Congress enacted the Trails Act, it included a statement of policy and declaration of purpose:

> "In order *to provide for the ever-increasing outdoor recreation needs of an expanding population* and in order *to promote the preservation of, public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas and historic resources of the Nation*, trails should be established (i) primarily, near the *urban areas* of the Nation, and (ii) secondarily, within *scenic areas* and along historic travel routes of the Nation, which are often more *remotely located.*" (Emphases added.) 16 U.S.C. § 1241(a) (2012).

Thus, rails-to-trails legislation exists for two reasons. First, it exists to prevent the abandonment of railroad corridors. Second, Congress' policy statement establishes that it also exists to create trails that the public may enjoy. Congress passed the Trails Act to promote trail development to which the "public [had] access" and could meet their "recreation needs."

In *Preseault*, the United States Supreme Court explained how Congress' stated purposes in the Trails Act established that trail use easements existed for public use. The *Preseault* Court explained:

> "Congress intended to 'encourage the development of additional trails' and to 'assist recreation[al] users by providing opportunities for trail use on an interim basis.' H.R.Rep., at 8, 9; S. Rep., at 9, 10 (same), U.S. Code Cong. & Admin. News 1983, p. 119; see also 16 U.S.C. § 1241(a) (Trails Act 'promote[s] the preservation of, public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas and historic resources of the Nation'). Second, Congress intended 'to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use.' H. R. Rep., at 8; S. Rep., at 9, U.S. Code Cong. & Admin. News 1983, p. 119; see also 16 U.S.C. § 1247(d)." 494 U.S. at 17-18.

23

Yet, the Sides complain that the Conservancy's easement for recreational trail use under the Trails Act is not for "public use" as meant under K.S.A. 60-509. In short, this argument is flawed given the purpose of the Trails Act. In their brief, the Sides mainly argue about how the Conservancy's trail use easement is distinct from any railroad easement. This argument has an unappealing technicality. For example, what matters is whether the Conservancy's distinct trail use easement is for public use. The only arguments the Sides make about why the trail use easement is not for public use is (1) that the Conservancy is a private entity and (2) that the Conservancy put no trespassing signs on the trail during the construction phase.

Nevertheless, 16 U.S.C. § 1247(d) explicitly states that a "qualified private organization" may serve as the party responsible for the trail. Moreover, under K.S.A. 58-3212(a)(3), the Conservancy had a duty to "provide for trail-user education and signs regarding trespassing laws and safety along the recreational trail." Because the trail was not yet developed, it seems the Conservancy was merely complying with its duty under K.S.A. 58-3212(a)(3) when it installed the no trespassing signs. Indeed, the Conservancy's no trespassing signs seem particularly necessary given the Sides' decision to hunt, trap, and run cattle along the trail use easement.

In addition, we are guided in this inquiry by a decision of the Maryland Court of Appeals. It considered and rejected this same argument made by the Sides in *Montgomery Cty. v. Bhatt*, 446 Md. 79, 99, 130 A.3d 424 (2016). Most significantly, in *Bhatt*, a landowner argued that he had obtained rights over the former railroad corridor by adverse possession. The court explained that Maryland law prevented adverse possession of lands held for public use. 446 Md. at 91. It then rejected the landowner's argument because "it [was] apparent that the succeeding interim use as a hiker/biker trail [was] within the accepted definition of 'public use' . . . ." 446 Md. at 99.

24

In summary, the Conservancy's trail use easement is an easement for public use. Indeed, the record establishes that some parts of the Meadowlark Trail are currently open for public use. As for the parts of the trail not yet open to the public, it is readily apparent that the Conservancy intends to open the trail for public use. As explained in *Attica*, real property held for "public use" can be property that is "owned or put to use by the public, or *for the establishment of interests in such property*." (Emphasis added.) 9 Kan. App. 2d at 329-30. Congress established that trails, and thus the easements necessary to create those trails, exist for public use in its Trail Act statement of purpose. Thus, K.S.A. 60-509 precludes the Sides from obtaining rights over the Conservancy's trail use easement either by adverse possession or prescriptive easement.

Last, we are guided in this inquiry by the Surface Transportation Board's (STB) decision in *Ao and Zhou*, No. FD 35539, 2012 WL 2047726 (June 6, 2012). The STB determined that landowners could not use Washington's adverse possession laws to obtain rights over a railbanked corridor on their land because invocation of the adverse possession laws would unreasonably interfere with railroad transportation, even if the railroad corridor was not currently being used for transportation. In reaching this decision, the STB noted that the party who maintained the railroad corridor under the Trails Act would not be able to maintain the corridor if the landowners adversely possessed it. The STB further noted the inability to conduct rail-related construction in case of reactivation. As a result, the STB held that the landowners' adverse possession claim was preempted by 49 U.S.C. § 10501(b)—the statute giving the STB authority to regulate rail carrier transportation. 2012 WL 2047726, at *6-8. Therefore, the trial court correctly denied the Sides' motion for summary judgment while granting the Conservancy's motion for summary judgment.

25

*Did the Trial Court Err by Ruling that K.S.A. 58-3213(c)'s Two-Year Time Limit to Develop a Trail Did Not Apply in This Case?*

The Sides argue that the trial court erred when it ruled that the Conservancy did not have to comply with K.S.A. 58-3213's two-year time limit to develop the trail. The Sides assert that the trial court misinterpreted K.S.A. 58-3213 when making its ruling. Then, the Sides argue that the Conservancy's failure to develop the trail within two years resulted in the Conservancy losing its ability to develop the trail. The Sides contend that the Conservancy's "opportunity to develop a recreational trail has expired, [meaning] nothing precludes [them] from continuing or undertaking activities that would interfere with the development of such a trail on the unused railroad right-of-way . . ."

The Conservancy responds that the Sides' argument fails for several reasons. First, the Conservancy argues that the trial court correctly determined that K.S.A. 58-3213(c) did not apply given that the ICC approved the Union Pacific's and Lindsborg's request to enter negotiations for NITU before the Legislature enacted the KRTA. Second, the Conservancy argues that even if K.S.A. 58-3213(c)'s two-year time limit applied, the remedy the Sides request is unavailable under the KRTA. Instead, the Sides' remedy would allow them to bring an action to enforce the KRTA as stated under K.S.A. 2018 Supp. 58-3215. Third, assuming arguendo that this court rejects its previous arguments, the Conservancy argues that K.S.A. 58-3213(c)'s two-year time limit violates 16 U.S.C. 1247(d) because 16 U.S.C. 1247(d) includes no time limits under which a trail sponsor must develop the trail. In other words, the Conservancy argues that federal law would preempt the application of K.S.A. 58-3213(c)'s two-year time to develop the trail.

*Standard of Review*

Here, the parties' dispute does not involve facts. Instead, their dispute turns on interpreting the KRTA and the Trails Act. An appellate court exercises de novo review

over the granting or denying of a summary judgment order when the parties do not dispute the facts. *Martin*, 297 Kan. at 246. Moreover, to the extent the parties' arguments involve interpretation of a statute, interpretation of a statute is a question of law over which an appellate court exercises de novo review. *Neighbor v. Westar Energy, Inc.,* 301 Kan. 916, 918, 349 P.3d 469 (2015).

*K.S.A. 58-3213 Inapplicable*

The Sides' entire argument hinges on the trial court misinterpreting the plain language of K.S.A. 58-3213(c) and (d).  Those provisions state:

"(c) The responsible party shall complete development of a recreational trail within a period of time equal to two years times the number of counties in which the recreational trail is located. Such period of time shall begin only when the appeal period pursuant to subsection (d) of 16 U.S.C. 1247 (1983) has expired. Any time during which there is pending any court action challenging the development or use of the trail shall not be computed as part of the time limitation imposed by this subsection.

"(d) The provisions of this section shall apply to only recreational trails for which approval to enter into negotiations for interim trail use is received from the appropriate federal agency on or after the effective date of this act."

The KRTA went into effect on July 1, 1996, when it was published in the statute book. See L. 1996, ch. 252, § 1.

Here, on September 28, 1995, the ICC served its "Decision and Notice of Interim Trail Use or Abandonment." In that decision, the ICC explained how on August 18, 1995, after Union Pacific applied for abandonment, Lindsborg requested a NITU. Then, the ICC explained that Lindsborg had thus far met the requirements to enter into negotiations with Union Pacific for interim trail use, and the Union Pacific was willing to negotiate. As a result, the ICC concluded that a "NITU [would] be issued under 49 CFR 1152.29.

27

*The parties [could] negotiate an agreement* during the 180-day period . . . ." (Emphasis added.)

On March 25, 1997, the STB issued a notice entitled "Union Pacific Railroad Company—Abandonment Exemption—in McPherson County, KS." In this notice, the STB provided a procedural history of the case. The STB recounted that on September 28, 1995, the ICC served its Decision and Notice of Interim Trail Use or Abandonment, resulting in a 180-day "trail use/railbanking condition [being] imposed under the [Trails Act], as requested by the City of Lindsborg." It then recounted how Lindsborg extended the trail use condition to September 22, 1996, in a decision served on March 26, 1996. Lindsborg extended its trail use condition at the request of a few other interested parties, including Friends of the Trail, who shortly afterwards changed its name to Central Kansas Conservancy.

At the end of this March 25, 1997 notice, the STB extended the trail use negotiating period for 30 days and named the Conservancy as the authorized party allowed to negotiate with Union Pacific. The STB concluded: "The NITU served [on] September 28, 1995, and extended by decisions served [on] March 26, 1996, and January 31, 1997, is modified to reflect that [the Conservancy] is authorized to negotiate a trail use/railbanking agreement with [Union Pacific]."

When denying the Sides' summary judgment motion, the trial court ruled that K.S.A. 58-3213(c)'s two-year time limit did not apply to the Conservancy because the ICC authorized Lindsborg to enter into negotiations for a NITU with Union Pacific on September 28, 1995, which was before July 1, 1996, the effective date of the KRTA. The Sides allege that the trial court should have started counting for K.S.A. 58-3213(c)'s two-year time limit purposes when the STB issued its March 25, 1997 decision. It seems the Sides believe that the trial court should have relied on the March 25, 1997 date because

28

this was when the STB authorized the Conservancy to negotiate for a NITU with Union Pacific.

Nevertheless, under the plain language of K.S.A. 58-3213(d), the section applies only to "recreational trails for which approval to enter into negotiations for interim trail use [was] received from the appropriate federal agency on or after the effective date of [the] act." Subsection (d) contains no exception about when a new party begins negotiating with the railroad for interim trail use. All that matters under subsection (d) is the date the federal agency approved interim trail use negotiations.

Furthermore, the Legislature distinguishes K.S.A. 58-3213 from K.S.A. 58-3212—the provision that involves duties of responsible parties. Subsection (d) of K.S.A. 58-3212 reads as follows: "The provisions of this section shall apply to all recreational trails, *regardless of when approval to enter into negotiations for interim trail use is or was received from the appropriate federal agency*." (Emphasis added.) The Legislature's decision to require "the provisions" of K.S.A. 58-3212 to "apply to all recreational trails," no matter when the federal agency approved negotiations for interim trail use, further undermines the Sides' interpretation of K.S.A 58-3213. This is because by enacting K.S.A. 58-3212(d), it is readily apparent that the Legislature knew how to enact broad legislation that applied to all trails regardless of when the federal agency approved interim trail use. Even so, the Legislature explicitly rejected using this language when enacting K.S.A. 58-3213(d). Instead, the Legislature excused the application of K.S.A. 58-3213(d) for recreational trails where the federal agency approved entering negotiations for interim trail use before the enactment of the KRTA.

Last, in their brief, the Sides emphasize that the Conservancy was not the party approved to enter negotiations for interim trail use with Union Pacific on September 28, 1996. The Sides, however, ignore that our Legislature determined that the date the federal agency approved *specific parties* negotiating for interim trail use was irrelevant for

29

determining whether K.S.A. 58-3213 applied. Instead, under the plain language of K.S.A. 58-3213(d) it is the date that the federal agency approved the *recreational trail* the parties were negotiating about for interim trail use that controls:  "The provisions of this section shall apply to only *recreational trails* for which approval to enter into negotiations for interim trail use is received from the appropriate federal agency on or after the effective date of this act." (Emphasis added.)

From the ICC's September 28, 1995 notice to the STB's March 25, 1997 notice, Union Pacific's, Lindsborg's, and the Conservancy's negotiations for interim trail use all concerned the same 12.6 miles of railroad corridor in McPherson County, which eventually became part of the Meadowlark Trail. As a result, the Sides' argument that under the plain language of K.S.A. 58-3213(d) "[a]ll that matters . . . is whether *any* such approval was received on or after the effective date" is incorrect. (Emphasis added.) In fact, the word "any" does not even appear in K.S.A. 58-3213(d).

The most fundamental rule of statutory interpretation is that the intent of the Legislature, as established by the plain language of a statute, governs. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). Our goal is always to ascertain the Legislature's intent through the plain language of a statute, giving ordinary words their ordinary meanings. 304 Kan. at 409. Thus, we must refrain from reading language into a statute that does not otherwise exist in the statute. 304 Kan. at 409.

Even so, in their brief, the Sides make policy arguments why this court should not apply the plain language of K.S.A. 58-3213(d). The Sides allege that the Legislature intended to exempt parties "who had gone so far in the process that they were at least to the point of negotiating an agreement with a railroad [when] the statute took effect" regardless of the plain language. Yet, if a statute is plain and unambiguous, we will not resort to the canons of statutory construction. 304 Kan. at 409. Thus, we need not consider the Legislature's policy reasons for enacting subsection K.S.A. 58-3213(d).

30

Moreover, despite the Sides' contention to the contrary, it is readily apparent that the Conservancy was involved in trail planning before the KRTA's enactment on July 1, 1996. This is evident because in the STB's March 25, 1997 decision, the STB noted that in its March 26, 1996 decision, it had extended Lindsborg's trail use condition on behalf of Friends of the Trail, who shortly afterwards became the Conservancy.

Simply put, the plain language of K.S.A. 58-3213(d) does not support the Sides' interpretation. The plain language of K.S.A. 58-3213(d) applies to only "recreational trails" where "approval to enter into negotiations for interim trail use [was] received from the appropriate federal agency on or after the effective date of this act." The effective date of the KRTA was July 1, 1996. Approval to enter into negotiations for interim trail use occurred on September 28, 1995, well before the KRTA went into effect. As a result, K.S.A. 58-3213, as a section, does not apply to the Conservancy. In turn, the trial court correctly ruled that the Conservancy had no duty to comply with K.S.A. 58-3213(c)'s two-year time limit to develop the trail.

*Sides' Requested Relief Unavailable*

Assuming arguendo that K.S.A. 58-3213(c)'s two-year period to develop the trail applies to the Conservancy, the Conservancy's argument that the Sides' requested relief does not exist under the KRTA has merit. In their brief, the Conservancy emphasizes that K.S.A. 2018 Supp. 58-3215 is the only provision within the KRTA that discusses a remedy. The remedy under K.S.A. 2018 Supp. 58-3215 is enforcement of the KRTA.

31

K.S.A. 2018 Supp. 58-3215 states:

> "If the responsible party fails to comply with the provisions of this act, any adjacent property owner, city or county aggrieved by the noncompliance may bring an action in the district court to enforce the provisions of this act. Upon a finding that the responsible party has failed to comply with the provisions of this act, the court may enter an order requiring the responsible party to comply with the provisions of this act."

No provision under the KRTA provides that the responsible party either loses its right to develop the trail or loses its right to the trail use easement by violating any provision of the KRTA.

In their reply brief, the Sides allege that the Conservancy's interpretation of the KRTA would have required them to file a noncompliance claim against the Conservancy before the Conservancy's two-year development period had expired. But the Conservancy does not make this argument. Moreover, the Conservancy's interpretation would not require the Sides to move the court for compliance before K.S.A. 58-3213(c)'s two-year period had expired. Clearly, a party could not move for relief under K.S.A. 2018 Supp. 58-3215 arguing that "the responsible party fail[ed] to comply with the provisions of [the] act," unless the responsible party had already violated that provision. Thus, this argument is flawed.

The Sides also stress that the Legislature did not enact the current version of K.S.A. 58-3215 until 2006 when the Legislature made an amendment to K.S.A. 58-3215. Between K.S.A. 58-3215's enactment in 1996 and the 2006 amendment, K.S.A. 58-3215 read as follows: "A city or county may institute procedures for recourse against the responsible party pursuant to 16 U.S.C. 1247 (1983) and 49 C.F.R. 1152.29 (1986) upon the failure of the responsible party to comply with the provisions of this act." L. 1996, ch. 223, § 5. 16 U.S.C. § 1247 (1983) is substantively identical to the current 16 U.S.C.

32

§ 1247. Moreover, 49 C.F.R. § 1152.29 (2019) is the STB regulation on "Prospective use of rights-of-way for interim trail use and rail banking."

Thus, the Sides are correct that they could not have personally used K.S.A. 58-3215 to force the Conservancy to comply with the KRTA until 2006. Yet, this does not change the fact that when the Legislature enacted the KRTA in 1996, it included a single remedy—having the city or county take recourse against the noncomplying responsible party under either 16 U.S.C. § 1247 (1983) or 49 C.F.R. § 1152.29 (1986). Under no circumstances, could an aggrieved landowner stop the development of a trail or a trail use easement under the previous version of K.S.A. 58-3215.

Furthermore, the Legislature's amendment in 2006 suggests that the Legislature believed that the predecessor version of K.S.A. 58-3215 was lacking because the previous version did not provide adjacent landowners the opportunity to sue as an aggrieved party under the KRTA. Nevertheless, when the Legislature added language that adjacent landowners could sue under the KRTA, the Legislature also added language in the amendment explicitly clarifying what was the remedy for the responsible party's failure to comply with the KRTA. The stated remedy was an order to comply with the KRTA.

As a result, only one remedy exists under the KRTA—an order to enforce the Act as stated under K.S.A. 2018 Supp. 58-3215. Thus, assuming that the Sides established that the Conservancy had not developed the trail in the time limits required under K.S.A. 58-3213(c), they could sue for enforcement of the KRTA under K.S.A. 2018 Supp. 58-3215. Even so, the Sides' actions desire to end any development of the trail; they want the court to enter an order stating that the Conservancy has no trail use easement.

Last, the Legislature's inclusion of the single enforcement remedy supports that the Legislature does not allow any other remedies under the KRTA. If the Legislature

33

intended for other remedies, like termination of the responsible party's right to develop the trail or termination of the trail use easement, the Legislature could have included that remedy under the KRTA. Again, this court must refrain from reading language into statutes that does not exist. *Ullery*, 304 Kan. at 409. To provide the remedy the Sides request, we would have to read language into the KRTA that does not exist.

Moreover, if we were to interpret the KRTA in a way that allowed a Kansas court to terminate a trail use easement issued by the federal government, we would need to consider the Conservancy's arguments about federal preemption. "If a court can find any reasonable way to construe a statute as constitutionally valid, it must do so." *Solomon v. State*, 303 Kan. 512, 523, 364 P.3d 536 (2015). Additionally, "[a]ppellate courts generally avoid making unnecessary constitutional decisions. Thus, where there is a valid alternative ground for relief, an appellate court need not reach a constitutional challenge." *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, Syl. ¶ 3, 367 P.3d 282 (2016).

Because K.S.A. 58-3213(c)'s two-year time limit does not apply and because K.S.A. 2018 Supp. 58-3215 establishes that the Sides' requested remedy is unavailable, we will not consider whether federal law preempts the application of K.S.A. 58-3213(c)'s two-year time limit to develop a trail. As a result, we determine that the Sides' argument fails.

*Did the Trial Court Err When Ruling on Fencing?*

The Sides argue that the trial court erred when making its fencing rulings in three ways: First, the Sides argue that the trial court erred by ordering them to pay one-half the costs to construct the fence. Second, the Sides argue that the trial court erred by ruling that the fence be constructed on the "sides of the right-of-way." Third, the Sides argue that the trial court erred by ruling that the Conservancy could enter its land outside the railroad corridor to construct the fence. The Sides allege that each of the trial court's

34

rulings are contrary to the plain language of K.S.A. 58-3212(a)(10). For these reasons, the Sides ask us to reverse and remand to the trial court, directing that the trial court order that the Conservancy pay for fencing, that the Conservancy place fencing nearer to the trail, and that the Conservancy not enter their property outside the railroad corridor while constructing the fence.

On the other hand, the Conservancy argues that the plain language of K.S.A. 58-3212(a)(10) supports the trial court's fencing rulings. Moreover, the Conservancy argues that Kansas law, as well as the facts here, establish the following: (1) that it has the right to place fencing on the partition of the railroad corridor; and (2) that it has the right to enter the Sides' property outside the railroad corridor while constructing the fence.

The trial court's fencing rulings occurred within its order granting the Conservancy's injunction against the Sides. An appellate court reviews the granting of an injunction for an abuse of discretion. *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012). A trial court abuses its discretion when the trial court commits an error of law or an error of fact or no reasonable person would agree with the trial court's decision. *Wiles v. American Family Life Assurance Co.,* 302 Kan. 66, 74, 350 P.3d 1071 (2015). When considering the trial court's factual findings, an appellate court must determine whether the factual findings were supported by substantial competent evidence that could support its legal conclusions. *Brown v. ConocoPhillips Pipeline Co.*, 47 Kan. App. 2d 26, 36, 271 P.3d 1269 (2011). The party challenging the granting of an injunction has the burden to establish that the trial court abused its discretion. *Steffes v. City of Lawrence*, 284 Kan. 380, 393, 160 P.3d 843 (2007).

To the extent the Sides' arguments involve interpreting statutes, interpretation of a statute is a question of law over which this court exercises de novo review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. at 918.

35

K.S.A. 58-3212(a)(10)—the provision in the KRTA on fences—states that the responsible party shall:

> "(A) maintain any existing fencing between the trail and adjacent property; (B) maintain any future fencing installed between the trail and adjacent property; (C) install between the trail and adjacent property fencing corresponding in class to that maintained on the remaining sides of such adjacent property; and (D) on request of an adjacent property owner, pay one-half the cost of installing fencing between the trail and such property owner's adjacent property with a fence of the class requested by such property owner, if not all remaining sides of such property are fenced."

Thus, upon obtaining a trail use easement under the Trails Act, the responsible party has a statutory duty to maintain any existing fencing on the railroad corridor. Further, the responsible party must maintain any fencing later installed on the railroad corridor. This is clear under the plain language of K.S.A. 58-3212(a)(10)(A) and (B). But subsection (A) does not speak to the quality of the existing fencing.

Under subsection (C), the responsible party must install fencing in the same "class" as the fencing maintained "on the remaining sides of such adjacent property." By using the language "remaining sides of such property," the Legislature conveyed that subsection (C) applied to adjacent properties where fencing existed on all sides but the trail. Hence, if the landowner of the adjacent property had the remaining sides of his or her property fenced, then the responsible party must fence the section along the railroad corridor so it attaches with the landowner's existing fencing. Moreover, the responsible party must use fencing that matches the landowner's existing fencing. As with subsection (A), subsection (C) does not speak to the quality of the landowner's existing fencing.

Meanwhile, subsection (D) applies when the landowner does not have all the remaining sides of the adjacent property fenced. In such situations, the responsible party and landowner will split the cost of placing fencing between the trail and the landowner's

36

property on the landowner's request. As a result, if the landowner has no fencing in place, subsection (D) would apply.

Turning to the facts, we know from the trial that Clinton testified that he had a barbed wire fence and electric fence around all of his property. Although Clinton did not explicitly state that his fencing ran along the sides of his property, Clinton's testimony implies that his fencing runs along the sides of his property.

The preceding facts call into question the trial court's ruling about fencing. To begin with, the trial court ruled that the Sides had to pay for half the fencing costs. Paying for half the fencing costs is appropriate under K.S.A. 58-3212(a)(10)(D) only if the sides of the adjacent landowner's property are not entirely fenced. But Clinton's testimony supports that the sides of the Sides' property are entirely fenced. Indeed, this was the only evidence before the court. Given Clinton's testimony, substantial competent evidence does not support the trial court's implied finding that less than all of the Sides' property was fenced. In turn, the trial court erred when it ruled that the Sides had to pay half the cost of fencing as stated under K.S.A. 58-3212(a)(10)(D).

Instead, absent evidence the Sides' property is not entirely fenced, the Conservancy must "install between the trail and adjacent property fencing corresponding in class to that maintained on the remaining sides of such adjacent property" as stated under K.S.A. 58-3212(a)(10)(C). This means that the Conservancy must install barbed wire and electric fencing along the railroad corridor. Thus, we reverse the trial court and remand with directions on this issue.

As for the existing fence along the railroad corridor, Clinton testified that this barbed wire fence was much deteriorated. He explained that his cattle walked right over the fencing. The Sides introduced photos of the barbed wire fencing on the railroad corridor into evidence. Those photos might have (1) established the existing fencing's

condition and (2) established the existing fencing's location. Nevertheless, the Sides have not included those photos in the record on appeal.

Below, the Sides emphasized that the Conservancy never maintained the barbed wire fence within the railroad corridor. The trial court determined that the Conservancy had not breached its duty to maintain fencing because no landowner along the Meadowlark Trail, including the Sides, truly wanted a fence. Moreover, the Sides had only recently requested a fence.

Certainly, the Sides' argument is a paradox. They complain that their fence was not maintained. At the same time, they did not want a fence and would not let the Conservancy onto their land to maintain the fence. Thus, the Sides' argument is seemingly a contradiction. The trial court did not err by weighing those facts against the Sides. In short, although the Conservancy had a duty to maintain the existing fence, the Sides had a duty to allow the Conservancy on the land to maintain the fence. Therefore, the Sides are partly to blame for the Conservancy's failure to maintain the existing fence. In essence, the trial court ruled that the Sides were contributorily negligent by keeping the Conservancy off of their land and not truly wanting their fence maintained. See K.S.A. 2016 Supp. 60-258a(a).

That said, K.S.A. 58-3212(a)(10)(A) requires the responsible party to "maintain" "existing" fencing. Black's Law Dictionary 1097 (10th ed. 2014) defines "maintain" as "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." "Exist" means "with respect to understood limitations or conditions." Merriam-Webster (online dictionary).

Clinton's testimony about the deteriorated state of the barbed wire fence raises questions about whether the fence was in an "existing" state that could be "maintained." The trial court made no specific fact-findings on whether the "existing" fence was in a

state that could be "maintained." Instead, it seems the trial court determined that the Conservancy was legally excused from maintaining the existing fencing, even in the future, because of the Sides' actions in the past.

Next, we note that under the plain language of K.S.A. 58-3212(a)(10) the conditions under subsection K.S.A. 58-3212(a)(10)(A) may occur simultaneously with subsections (C) or (D). That is, the plain language of K.S.A. 58-3212(a)(10) requires responsible parties to maintain existing fencing, as well as install corresponding fencing when the adjacent landowners have the remaining sides of their property fenced as stated under subsection (C), and install fencing of the requested class at one-half the cost when the adjacent landowners do not have the remaining sides of their property fenced as stated under subsection (D). In K.S.A. 58-3212(a)(10), the Legislature used the conjunction "and," as opposed to "or," showing that courts must consider the clauses within K.S.A. 58-3212 jointly. As a result, under the plain language of K.S.A. 58-3212(a)(10), there could be circumstances where there are multiple fences, of different classes, between the trail and the adjacent property.

Consequently, the trial court erred by excusing the Conservancy from maintaining the existing fencing without engaging in proper fact-finding. As a result, we remand to the trial court to consider if the fencing that exists already on the railroad corridor is in a condition that can be maintained.

Concerning the Sides' arguments about the location of the fence, the Sides argue that the fence may be constructed immediately next to the trail. They challenge the trial court's determination that the Conservancy could construct "an appropriate barbed wire fence along both sides of the right-of-way" in two ways.

First, the Sides complain about the Conservancy's noncompliance with K.S.A. 58-3212(a)(10)(A). Nevertheless, to the extent K.S.A. 58-3212(a)(10)(A) applies, because

the responsible party must maintain existing fencing, the location of the existing fencing determines the location of that fence. There is no language under the plain language of the statute on relocation of the fence, which the Sides' argument seems to require.

Second, the Sides allege that "K.S.A. 58-3212(a)(10), does not require the fencing of the boundaries of the railroad right-of-way, it requires the fencing of the 'trail.'" The Sides, however, misstate K.S.A. 58-3212(a)(10). Subsection (C) states that fencing must be installed "between the trail and adjacent property fencing." Subsection (D) states that fencing must be installed "between the trail and such property owner's adjacent property." "Between" means "in the time, space, or interval that separates." Merriam-Webster (online dictionary). Thus, from the plain language of subsections (C) and (D), it is readily apparent that the fencing must be located in the space that separates the trail from the adjacent property owner's land.

Next, the Sides' argument focuses much on what the Conservancy is going to do with the rail corridor. The Sides stress that the actual walking path along the rail corridor is going to be a single lane. Cullen testified that the walking path would be the flat part of the railroad bed. The Sides equate the walking path to the trail. But it is undisputed that the entirety of the railroad corridor is an easement for *trail use*. This means that the entirety of the railroad corridor *constitutes a trail* under the Trails Act. As a result, regardless of whether subsection (C) or (D) applies, the fence must be located in the space that separates the Sides' property from the Conservancy's trail use easement.

Despite the preceding, the Sides also cite old cases about a landowner's ability to use the railroad corridor as the railroad operated. For instance, the Sides cite *K.C. Rly. Co. v. Allen*, 22 Kan. 285, 294, 1879 WL 836 (1879), where our Supreme Court held that a landowner had the right to use the rail corridor "for every purpose not incompatible with the rights of the road." Yet, this caselaw predates the plain language of the KRTA which supports partition fencing. Moreover, even in *Kansas Central Railway*, our

40

Supreme Court held that the railroad had a "perfect right to fence up its road . . . ." 22 Kan. at 294. The landowner was merely allowed to use the corridor in ways that did not interfere with the railroad and the railroad's fencing. Furthermore, as noted by the trial court in rejecting the Sides' fencing arguments, the Sides presented no evidence that they had a compatible use for the railroad corridor. Cattle grazing, hunting, and trapping are not compatible with a public trail. Moreover, as noted by the trial court, the Sides presented no "evidence that there [was] tillable ground near the right of way."

Last, as indicated by the Kansas Farm Bureau in its amicus brief, when the Conservancy constructs the fencing, it has a right to enter onto the Sides' property. In *Muhl v. Bohi*, 37 Kan. App. 2d 225, 234, 152 P.3d 93 (2007), this court adopted the standard from Restatement (Second) of Torts § 190 (1964):

> "'A duty or privilege to build or repair a party wall or division fence between land in the possession of the actor and land in possession of another, confers on the actor a privilege to enter the other's land at reasonable times and in a reasonable manner, in order to build or repair such party wall or division fence.'"

The *Muhl* court turned to the Restatement because Kansas' general fence statutes and caselaw provided no answer on whether the actor building a partition fence had a right to enter the neighboring land. 37 Kan. App. 2d at 233-35.

The *Muhl* case guides this court (1) because the KRTA also lacks provisions on whether responsible parties have the right to enter an adjacent property to maintain or build a fence, and (2) because there is no caselaw on this issue. Moreover, as in *Muhl*, the fact the Restatement supports allowing the fence building party onto another's land is persuasive. When adopting the Restatement, the *Muhl* court explained: "If an adjoining landowner is given the statutory authority to repair or to rebuild a partition fence, then, by implication, the adjoining landowner should be permitted to enter on the land of the other adjoining landowner for that purpose." 37 Kan. App. 2d at 234.

41

The same principle applies here. Under K.S.A. 58-3212(a)(10)(A) and (B), the responsible party must maintain existing and future fences. Under K.S.A. 58-3212(a)(10)(C) and (D), there are situations in which the responsible party must build fences. The plain language of K.S.A. 58-3212(a)(10)(A) establishes that the responsible party must maintain the existing fence where it already exists. Thus, there is no provision allowing either the responsible party or the adjacent landowner to relocate the existing fence. As explained earlier, K.S.A. 58-3212(a)(10)(C) and (D) require partition fencing.

Therefore, as in *Muhl*, under K.S.A. 58-3212(a)(10)(C) and (D), the responsible party has the "statutory authority to repair or to rebuild a partition fence." 37 Kan. App. 2d at 234. For these reasons, the Conservancy may enter onto the Sides' property when constructing a fence as stated under subsections (C) and (D). The Conservancy's right to enter onto the Sides' land when maintaining an existing fence under subsection (A) likely depends on its location, that is, whether it is a partition fence. As a result, on remand to the trial court, if the existing fence is in a state that can be maintained, the trial court should consider if the fence is a partition fence. If so, the Conservancy would have a right to enter the Sides' property to maintain the fence.

Because we can decide all fencing issues without considering Kansas' general fencing statutes, we decline to reach the parties' arguments on the application of Kansas' general fencing statutes.

Affirmed in part, reversed in part, and remanded to the trial court with directions to reconsider its fencing ruling in a manner consistent with this opinion.